Probate Court, Merrimack County
No. 78-090

## THE STATE OF NEW HAMPSHIRE

### v.

### ROBERT H. _____

October 30, 1978

*Thomas D. Rath*, attorney general (*David W. Marshall*, attorney orally), for the State.

*Kenneth L. Robinson, Jr.*, of Concord, by brief and orally, for Robert H. ————.

DOUGLAS, J. This is an appeal pursuant to RSA ch. 567-A (Supp. 1977) from a decision of the Merrimack County Probate Court terminating the parental rights of Robert H. ———— over his three minor children on the grounds of failure to correct the conditions leading to a finding of neglect. RSA 170-C:5 III. We outline the standard to be applied in such cases and remand.

The three minor children of Irene and Robert H. ———— were first found to be neglected and placed in the custody of the division of welfare in 1973. The Franklin District Court noted that the parents frequently changed residences, often moved into substandard housing, had an unstable marriage, and failed to care properly for the children. In March 1975, the division of welfare petitioned the Merrimack County Probate Court to terminate the parental rights of Irene and Robert over the children. In December 1975, the probate court denied the petition and stated, "the evidence that . . . [the parents] have failed to remedy the conditions which led up to a finding of neglect . . . is neither clear nor convincing." In part the division of welfare was found to have failed to communicate adequately to the parents what was specifically required of them to regain custody of their children. The division was ordered to develop a specific plan for returning the children to their natural parents.

The plan submitted by the division in February 1976 called for the parents to continue their employment, reimburse Merrimack County for support of the children, establish a permanent home, and seek and receive parenting counselling through a mental health clinic. Robert was told not to be involved in criminal activity. He subsequently changed employment, was divorced pursuant to a libel brought by Irene, lost his job, and was arrested for assault. In October 1976, the division filed new petitions seeking to terminate parental rights under RSA 170-C:5 III. One year later, following hearings in April and May 1977, the Merrimack County Probate

Court issued a decree terminating the rights of Robert and Irene. Only Robert appealed, and his exceptions were transferred by *Cushing, J.*

RSA ch. 170-C was enacted to "provide for the involuntary termination of the parent-child relationship by a judicial process which will safeguard the rights and interests of all parties. . . ." RSA 170-C:1. A termination order must be based upon "clear and convincing evidence. . . ." RSA 170-C:10. The New Hampshire Constitution, part I, article 2, recognizes that "[a]ll men have certain natural, essential, and inherent rights—among which are, the enjoying and defending life and liberty . . . and . . . seeking and obtaining happiness." It is axiomatic that the State "does not need to grant parents authority they already have and which is, under our political theory, prior to the state itself." Hafen, *Puberty, Privacy, and Protection: The Risks of Children's "Rights,"* 63 A.B.A.J. 1383, 1388 (1977).

This principle has been recognized by the United States Supreme Court in a number of decisions. In *Prince v. Massachusetts,* 321 U.S. 158, 166 (1944), the Court said, "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." In *Wisconsin v. Yoder,* 406 U.S. 205, 232 (1972), the Court rested its holding in part on the constitutional right of parents to assume the primary role in decisions concerning the rearing of their children. That right is recognized because it reflects a "strong tradition" founded on the history and culture of Western civilization, and because the parental role is "now established beyond debate as an enduring American tradition." Appropriate limits come not from drawing arbitrary lines but rather from careful "respect for the teachings of history [and] solid recognition of the basic values that underlie our society. . . ." *Griswold v. Connecticut,* 381 U.S. 479, 501 (1965) (Harlan, J., concurring). The role of parents in the life of a family has attained the status of a fundamental human right and liberty. "And it is now firmly established that 'freedom of personal choice in the matters of . . . family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment.' " *Quilloin v. Walcott,* 434 U.S. 246, 255 (1978) *citing and quoting from Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 639–40 (1974). In *Moore v. East Cleveland,* 431 U.S. 494 (1977), a housing ordinance was struck down insofar as it infringed on "extended families" living together. Because it infringed on fundamental rights, the minimum rationality

test was inappropriate. "Of course, the family is not beyond regulation." *Id.* at 499. However, "the Due Process Clause would be offended '[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.'" *Quilloin* 434 U.S. at 255, *citing and quoting from Smith v. Organization of Foster Families,* 431 U.S. 816, 862–63 (1977) (Stewart, J., concurring).

■　On an international level, the United Nations Covenant on Civil and Political Rights holds that "the family is the natural and fundamental unit of society and the State." Art. 23, s. 1 (1966). Likewise the United Nations Covenant on Economic, Social and Cultural Rights recognizes that the "widest possible protection and assistance should be accorded to the family, which is the natural and fundamental group unit of society. . . ." Art. 10, s. 1 (1966). The family and the rights of parents over it are held to be natural, essential, and inherent rights within the meaning of New Hampshire Constitution, part I, article 2.

■　When dealing with legislative activity in the area of fundamental rights this court has applied the strict scrutiny test. Thus before the State may involuntarily confine a person in a psychiatric ward, we have required that a showing of that person's dangerousness be made by the State to the satisfaction of a judge beyond a reasonable doubt. Involuntary commitment proceedings, "whether civil or criminal," involve a deprivation of liberty "which constitutes a grievous loss." *Gibbs v. Helgemoe,* 116 N.H. 825, 828, 367 A.2d 1041, 1043 (1976), and *State v. Gregoire,* 118 N.H. 140, 384 A.2d 132 (1978). The same reasonable doubt standard applied as "an essential requirement of due process in adjudicatory juvenile delinquency proceedings." *Gibbs, id.* The loss of one's children can be viewed as a sanction more severe than imprisonment. *Note: In the Child's Best Interest: Rights of the Natural Parents in Child Placement Proceedings,* 51 N.Y.U.L. Rev. 446, 467 (1976); *Danforth v. State Dep't of Health and Welfare,* 303 A.2d 794, 800 (Me. 1973). The permanent termination of the rights of parents over their children is even more final than involuntary commitment or delinquency proceedings. Therefore, the government must prove its case under chapter 170-C beyond a reasonable doubt before the permanent termination of liberty and natural rights of parents guaranteed under New Hampshire Constitution, part I, article 2 can occur. *See also*

*Alsager v. District Court*, 406 F. Supp. 10 (S.D. Iowa 1975), *aff'd*, 545 F.2d 1137 (9th Cir. 1976) (per curiam) and Day, *Termination of Parental Rights Statutes and the Void for Vagueness Doctrine: A Successful Attack on the Parens Patriae Rationale*, 16 J. of Family Law 213 (1977–78).

The grounds for termination relating to neglect are set forth in RSA 170-C:5 II. The focus of subsections II and III appears to be on the actions or neglect of the parents, and lacks adequate focus on specific harm to the children. The American Bar Association Juvenile Justice Standards Project's *Standards Relating to Abuse and Neglect* (1977) endorse coercive State intervention "only when a child is suffering specific harms. . . ." Standard 1.1. This is because "[e]xtensive intervention carries a substantial risk of intervening to 'save' children of poor parents and/or minority cultures." *Standards,* Commentary at 37, *supra.* In *Smith v. Organization of Foster Families*, 431 U.S. 816, 834 (1977), the United States Supreme Court noted that "Studies . . . suggest that social workers of middle-class backgrounds, perhaps unconsciously, incline to favor continued placement in foster care with a generally higher-status family, thus reflecting a bias that treats the natural parents' poverty and lifestyle as prejudicial to the best interests of the child." This view is also recognized by the Commentary to the A.B.A. *Standards Relating to Abuse and Neglect:*

> Too often under current practice, there is no direction or incentive for parents or agency to work towards return of the child. The court rarely, if ever, requires a plan and does not review the case to see what is being done. The pressures of agency workload, aggravated by inadequate staff and financing, are such that as long as a child in placement raises no problems, he/she will not get any attention. Dealing with the parents may be time-consuming and, according to the agency's priorities, unproductive. If a child is not having difficulty in placement, the agency may consider it to be in the child's "best interest" to remain in placement, even if the child would now be safe in his/her own home. Therefore, no effort is made to work towards return. To be consistent with the underlying goals of these standards—that children's interests are generally best served by assuring them a continuous safe home with their parents—it is imperative that any plan for removal include clear commitments by parents and agency to take the necessary action to return the child to a safe home. *Id.* at

132. *See* Wald, *State Intervention on Behalf of "Neglected Children in Pursuing Justice for the Child* 246, 249 (M. Rosenheim ed. 1976).

In an "ideal world, children would not be brought up in inadequate homes." Wald, *supra* at 265. But this is not an ideal world, and to hold merely that inadequate parenting, absent specific harm to the children, is sufficient to terminate parental rights in the "best interest of the child" is too vague a concept and places undue emphasis on the parental conduct rather than on any harm to the child. Wald, *supra* at 264; *Alsager*, 406 F. Supp. 10 (S.D. Iowa 1975), *aff'd*, 545 F.2d 1137 (9th Cir. 1976).

In the instant case, the father is thirty-two, he can neither read nor write, suffers serious heart problems, weighs 282 pounds, and, because of limited job skills, is rarely steadily employed. His children are six, seven, and nine. This personal situation leads to low income, and thus low or substandard living and housing conditions. The children were described by the guardian ad litem as "extremely attractive and affectionate. They are very much a family unit with strong sibling ties." Robert H. asserts that his inability to comply with the February 1976 plan by the caseworker was caused by his lack of employment skills, his physical problems, his divorce, and the conduct of the division of welfare. The lower court ruled that Robert H. had failed to correct the conditions leading to the earlier 1973 finding of neglect.

Robert H. asserts that he should have been assisted and counselled by the caseworkers in charge of his file, and that, prior to terminating his rights, the division should have been more helpful. *In the Matter of Doe*, 118 N.H. 226, 385 A.2d 221 (1978), rejected that argument, but we reexamine it in light of the holding in this case. The testimony in the termination hearing in the instant matter revealed that the caseworker had only talked to Robert H. once, had not consulted with the prior caseworker, and was not aware of the seriousness of Robert's health problems or his employment situation.

Regulations issued by the division of welfare pursuant to RSA 161:4 provide that:

> In termination petitions originated by the Division, the social worker has a particular responsibility to prove the grounds of termination and to *ensure that every effort has been made to enable the parents to provide a family for their own children.* In this respect, social workers will need to include in their social studies not only evidence to jus-

tify the grounds of the petition, but also evidence of attempts, both by the Division and other agencies, *to work with the parents.* Section 6103.1(d), SR 77-45 (*emphasis added*).

While additional intensive staff time will be necessary to provide a record that proves the division made "every effort" and "worked with the parents," the government must provide this record before it takes so drastic a step as to sever irrevocably the parental ties to the children. To the extent *In the Matter of Doe* holds that the division may do otherwise, it is overruled.

 Although we acknowledge the many frustrations and problems already facing overworked caseworkers, we hold that absent a showing of specific harm to the children, "growing up in a so-called disadvantaged home is not a sufficient basis for coercive intervention." Wald, *supra* at 252. Robert H. may not be a model parent, but he is as entitled to help from the division as anyone else, and maybe more so. On one visit with the caseworker, Robert H. "stated that he was not able to find a job and he felt like committing suicide. He felt that the Welfare Department had taken away his life. . . ." When the question of agreeing to relinquishing his parental rights came up, Robert H. "began to cry and I was finally able to calm him down and he stated he would sign [sic] relinquishment if he could see his children one more time."

> The state of this family is duplicated in hundreds of thousands of American families,—transiency and incapacity, poverty and instability. The witness was undoubtedly correct when he stated that living in the McMaster's household would not allow this child to maximize her potential. However, we do not believe the legislature contemplated that parental rights could be terminated because the natural parents are unable to furnish surroundings which would enable the child to grow up as we would desire all children to do . . . The best interests of the child are paramount; however, the courts cannot sever the McMaster's parental rights when many thousands of children are being raised under basically the same circumstances as this child. The legislature had in mind conduct substantially departing from the norm and unfortunately for our children the McMaster's conduct is not such a departure.

*State v. McMaster,* 259 Ore. 291, 303–04, 486 P.2d 567, 572–73 (1971); *see State v. Worrell,* 198 Neb. 507, 253 N.W.2d 843 (1977).

This case must be remanded to enable the division of welfare to work affirmatively with this family and provide and arrange for the appropriate social service agency intervention. In the event this is unsuccessful, any termination petition under chapter 170-C must be proven beyond a reasonable doubt to meet the requirements of the New Hampshire Constitution.

*Vacated and remanded.*

GRIMES & BROCK, JJ., did not sit; the others concurred.