Grafton County Probate Court
No. 90-056

*In re* LISA H.

April 26, 1991

*Hughes, Miller & Candon*, of Norwich, Vermont (*Jane H. Davison* on the brief and orally), for Sharon G., the mother of Lisa H.

*Daschbach, Kelly & Cooper*, of Lebanon (*Deborah J. Cooper* on the brief, and *Timothy Caldwell* orally), as guardian ad litem for Lisa H.

*John P. Arnold*, attorney general (*Claire L. Gregory*, assistant attorney general, on the brief and orally), for the State.

THAYER, J.   By petition to the Grafton County Probate Court, the New Hampshire Division for Children and Youth Services (DCYS) sought the termination of Sharon G.'s parental rights over her natural daughter, Lisa H., under RSA chapter 170-C. After a full hearing on the merits of the petition, the Court (*Boyle*, J.) allowed the petition in accordance with the recommendation of the guardian ad litem. The respondent, Sharon G., has essentially made three claims of error. She first contends that the probate court erred in finding that the evidence produced at the hearing established abandonment beyond a reasonable doubt. The respondent's second contention is that the probate court abused its discretion and erred as a matter of law in finding that DCYS used its "best efforts" to rehabilitate her as a parent. The respondent also claims that the probate court's findings as to DCYS's efforts are contrary to the evidence produced below. We affirm.

Lisa H. was born to the respondent and Stephen H. on February 25, 1975, and is now sixteen years old. Lisa's parents were divorced in 1982, and Stephen H. subsequently died in 1984. That same year, the respondent was remarried to Francis G., and from 1984 to 1987 Lisa and her older sister, Tracy H., lived with the respondent and Francis G. in Meriden. In March, 1987, Lisa alleged that she had been sexually abused by her stepfather. On May 26, 1987, the Claremont District Court entered a finding of abuse against Francis G. and neglect against the respondent for her refusal to protect Lisa. Thereafter, Lisa was placed in a foster home, where she remained until her maternal aunt and uncle, Penny and Timothy P., discovered her plight and requested that Lisa be placed in their custody. On July 12, 1987, Lisa was placed in the care of Penny and Timothy P., and she has been living with them continuously since that date. In its dispositional order, the district court ordered counseling and therapy for Lisa, psychological evaluations for the respondent and

Francis G., and visitation to be arranged as frequently as possible and at reasonable times. Neither the respondent nor Francis G. has complied with the ordered evaluations, although Lisa has undergone extensive counseling.

In April, 1989, Lisa requested that she be adopted by Penny and Timothy P. Because termination of Sharon's rights was a prerequisite to adoption, DCYS filed a petition on May 22, 1989, for the termination of Sharon's parental rights over Lisa. The petition alleged that the respondent had abandoned her daughter between December, 1987 and December, 1988. Pursuant to the probate court's initial hearing order, an independent social study regarding Lisa was performed. The probate court then held another hearing on November 9, 1989, at which the respondent was present with counsel. Following the hearing, the probate court found that the respondent "made only minimal efforts to communicate with Lisa H." The court also agreed with the results of the social study and the report of the guardian ad litem, and found that termination of the respondent's parental rights was in Lisa's best interests; accordingly, the court granted the request.

Evaluation of the respondent's contentions requires a review of the structure of RSA chapter 170-C. This statute provides that one of the conditions described in RSA 170-C:5 (Supp. 1990) must be established before a court may order the termination of parental rights. These conditions may arise out of a parent's disability or his or her wrongful act or omission. One such wrongful act is abandonment of the child by the parent. RSA 170-C:5, I.

Although RSA 170-C:5 does not comprehensively define "abandonment," it does provide examples of factual circumstances which create a presumption of abandonment. A parent's failure to communicate with his or her child for a period of six months is one such example. The statute and our prior decisions make it clear that a determination of abandonment is essentially factual. *See, e.g., In re Matthew G.*, 124 N.H. 414, 416, 469 A.2d 1365, 1366 (1983). This determination has been delegated to the probate court by statute, and we will not disturb the court's decree unless it is unsupported by the evidence or plainly erroneous as a matter of law. RSA 567-A:4 (Supp. 1990); *see also In re Kristopher B.*, 125 N.H. 678, 684, 486 A.2d 277, 282 (1984). Moreover, our prior cases have established that the State must prove its case under RSA chapter 170-C beyond a reasonable doubt. *In re Jessica B.*, 121 N.H. 291, 294, 429 A.2d 320, 322 (1981). Therefore, our analysis begins with the record, and a determination

as to whether the evidence produced below proves abandonment beyond a reasonable doubt.

Our inquiry focuses on the period of time between December, 1987 and December, 1988, because the petition alleges that the respondent abandoned Lisa during this period. The probate court found that, from December, 1987 until June, 1988, the respondent lived approximately twenty minutes away from Lisa. During that time, it is undisputed that the respondent had transportation and regular employment. She asserts that she visited her daughter on two occasions during this period of time, and sent a birthday card and three pairs of socks to Lisa in February, 1988. DCYS contends that no visitation has taken place between mother and daughter since March or April, 1988. The record shows that in January, 1988, DCYS obtained an order from the superior court that required regular visitation between Lisa and her sister, Tracy H. The court also ordered the respondent to return all personal belongings to Lisa and required social security payments available to Lisa to be paid to Timothy and Penny P. for Lisa's support.

In June, 1988, the respondent moved to Virginia. Whether she informed Lisa of the move is disputed. Nevertheless, it is clear that the respondent has never given her daughter, Timothy and Penny P. or DCYS her unlisted telephone number in Virginia. Lisa testified that she only learned of her mother's whereabouts after her sister, Tracy H., called her several months after the respondent had moved to Virginia. The respondent did not see or communicate with Lisa throughout the period between June, 1988 and December, 1988. Lisa received no card, telephone call or gift from her mother during the Christmas season in 1988, nor did she get a card, telephone call, or gift on her fourteenth birthday in February, 1989.

Moreover, DCYS sent three letters to the respondent during the summer of 1988 in order to solicit her input on a permanent plan for Lisa, and to determine what support and visitation arrangements she was considering for her daughter's future. However, it was not until January, 1989, that the respondent sent a letter to DCYS in response. This letter professed her love for Lisa, but failed to address her plans for the future support, visitation and care of her daughter. In April, 1989, Lisa requested that her mother's parental rights be terminated in order to accommodate Lisa's adoption by Penny and Timothy P.

■■ The record is replete with evidence that proves beyond a reasonable doubt that Lisa was abandoned within the meaning of

RSA 170-C:5. We recognize the sanctity of the family relationship; the custody, care and nurture of the child reside first with the parent. But a parent's authority is not only a natural and essential right, which is prior to the State itself; it is an obligation. Generally, neither the State nor this court will interfere with the fulfillment of these parental obligations. *See State v. Robert H.* ——, 118 N.H. 713, 715, 393 A.2d 1387, 1388 (1978). Nonetheless, when a parent's conduct "evidences a settled purpose to forego all parental duties and relinquish all parental claims to the child," the State is forced to determine how to fill this critical vacuum in the child's life. *In re Jessica B.*, 121 N.H. at 295, 429 A.2d at 323 (quoting *Fortino v. Timko*, 110 N.H. 200, 263 A.2d 663, 664 (1970)).

In the case before us, the contact between mother and daughter has been minimal at best. The statute provides that abandonment may be found when a parent leaves his or her child in the care and custody of another with only minimal efforts to support or communicate with the child for a period of at least six months. RSA 170-C:5, I. This case involves minimal contact over the span of one year. Even accepting the truth of the respondent's assertions, a few telephone calls, one or two visits, a birthday card and three pairs of socks over the course of one year do not indicate an intent to provide for the care and support of a child. Nor do these exchanges indicate an attempt to initiate any meaningful contact with the child. Therefore, the record proves abandonment beyond a reasonable doubt.

We note here that the probate court also found that it was in Lisa's best interest to terminate her mother's parental rights. The court's consideration of this issue is necessary, but only after a finding of abandonment or one of the other statutory conditions for termination of parental rights. *Matthew G.*, 124 N.H. at 416, 469 A.2d at 1366. We realize that after living with foster parents for two or three years, a child may well have developed a strong psychological bond with his or her foster parents and the surroundings that they provide. *In re Kristopher B.*, 125 N.H. 678, 684, 486 A.2d 277, 282 (1984) (citations omitted). For instance, the social study of Lisa reveals that she refers to Penny and Timothy P. as "mom" and "dad," while she refers to the respondent as "Sharon." In addition to the above factors, we note that Lisa has rapidly progressed in school and within her new home since she began living with Penny and Timothy P. The record is consistent with our construction of the requirements of the statute, and we affirm the probate court's finding that the termination is in Lisa's best interests.

■ We now address the question of whether DCYS used its best efforts to work with the respondent and facilitate the reunification of her family. In *Robert H.* ——, this court held that the State must provide a record that proves it used "every effort" toward rehabilitation, and "worked with the parents," before parental rights may be terminated. 118 N.H. at 719, 393 A.2d at 1391. *In re Diana P.* required that courts consider the realities of DCYS's limited resources when determining whether a parent was given every opportunity to correct the situation that created the need to terminate the parent's rights. 120 N.H. 791, 798, 424 A.2d 178, 182 (1980), *cert. denied,* 452 U.S. 964 (1981). Although we recognize that DCYS's efforts to work with a parent may be limited by "practical considerations," *In re Kristopher B.,* 125 N.H. at 681–82, 486 A.2d at 280, it is axiomatic that termination of parental rights is an alternative only when DCYS has fulfilled its duty to use "every effort to work with the natural parents" and reunite the natural family. *Id.* at 681, 486 A.2d at 280.

Although we are not overwhelmed by the record of DCYS's efforts in this case, the particular circumstances here indicate that the agency has made every effort, within reason, to work with the respondent and facilitate the reunification of her family. From the outset, DCYS was involved in this case. The agency developed a case plan for Lisa and periodically updated it. Prior to the respondent's move to Virginia, DCYS's efforts were geared toward reunification. Case workers from DCYS arranged unsupervised visits between the respondent and Lisa approximately one month after Lisa was placed in the foster home in 1987. Yet the respondent herself testified that she only visited her daughter twice between December, 1987 and June, 1988. The record shows that the respondent has put no effort into reuniting her family. She has done absolutely nothing to address the alleged sexual abuse which originally created the need to remove Lisa from her custody. As the lower court appropriately found, "Sharon G. has not provided Lisa H. with a satisfactory answer to Lisa H.'s very important question of why Sharon G. would not believe [her] allegation of sexual abuse by Francis G." Furthermore, neither the respondent nor Francis G. has undergone the court-ordered evaluation that resulted from that abuse and neglect proceeding. The evidence suggests that the respondent's apathy toward maintaining her parental rights limited what DCYS could have accomplished.

Moreover, once the respondent moved to Virginia, the obstacles preventing reunification became increasingly difficult for DCYS to overcome. Lisa contacted her mother only by utilizing an elaborate

grapevine which involved calling relatives in Texas, who called a grandmother, who in turn called the respondent to inform her that Lisa wanted to speak to her. Lisa then had to wait for the respondent to call her. Similarly, the respondent has never given DCYS her phone number in Virginia. Nonetheless, DCYS eventually obtained her address from Penny P. and wrote the respondent several letters which expressed concern over the future support and visitation of Lisa and inquired whether the respondent had any plans for her daughter. She did not respond to these letters, however, for nearly six months. Although the respondent's letter professed her love for her daughter, this sudden expression of love must be placed within the context of her actions over the previous year. "Abandonment is not . . . an ambulatory thing, the legal effects of which a delinquent parent may dissipate at will by the expression of a desire for the return of the discarded child." *In re Jessica B.*, 121 N.H. at 295, 429 A.2d at 323 (quoting *Wallace v. Lougee*, 107 N.H. 251, 254, 221 A.2d 780, 783 (1966)).

In sum, no action taken by the respondent indicates to this court that she wanted a continuing relationship with Lisa. Under these narrow circumstances, any further effort by DCYS may very well have been futile. It is difficult to imagine how DCYS could have motivated the respondent to accept her maternal obligations, regardless of the agency's available resources. Consequently, the probate court did not err as a matter of law or fact in finding that DCYS fulfilled its statutory duty to use every effort available to work with the respondent.

The probate court's findings of fact and rulings of law indicate that the issue of DCYS's obligation to use its best efforts was fully considered in the judgment. The respondent's requested finding of fact that DCYS did not make any effort to rehabilitate her was denied. Nevertheless, the court did not explicitly rule on whether DCYS, in fact, fulfilled its obligation. The omission is not reversible error, however, because "in the absence of specific findings, a court is presumed to have made all findings necessary to support its decree." *Demers Nursing Home, Inc. v. R.C. Foss & Son, Inc.*, 122 N.H. 757, 761, 449 A.2d 1231, 1234 (1982) (quoting *Burns v. Bradley*, 120 N.H. 542, 546, 419 A.2d 1069, 1072 (1980)). Therefore, as a matter of law, we cannot say that the trial court's decision was not adequately supported.

*Affirmed.*

All concurred.