Grafton County Probate Court
No. 92-111

*In re* JESSIE E.

June 30, 1993

*Richard V. Aborjaily*, of Norwich, Vermont, by brief and orally, for the mother, Michelle E.

*Barbara B. Hill*, of Lebanon, by brief and orally, for the guardian, Ann J.

*Richard E. Mullaly*, of West Lebanon, by brief as guardian ad litem for Jessie E.

BROCK, C.J. Michelle E. is the natural mother of Jessie E. Since 1986, Jessie has been under the full-time care and custody of Ann J., who is Jessie's aunt and guardian. Michelle appeals the decision by the Grafton County Probate Court (*O'Neill*, J.) terminating her parental rights and continuing Ann's guardianship over Jessie. We affirm in part, vacate in part, and remand.

Jessie was born on July 7, 1985, to Michelle and Jeffrey E. At the time of Jessie's birth, Michelle and Jeffrey were not married, but they were living together in Canaan. Jeffrey suffered from an alcohol problem. Michelle, who was then seventeen years old, was solely responsible for the household's income. Beginning in September 1985, Ann, who is Jeffrey's sister, began assisting in Jessie's care while Michelle was at work.

Jeffrey and Michelle petitioned the probate court in April 1986 to appoint Ann as Jessie's guardian, though in May 1986, Michelle sought to withdraw from the petition. The court ordered a hearing, at which it continued the matter, ordered the New Hampshire Division for Children and Youth Services (DCYS) to complete a home study, and appointed Richard E. Mullaly as guardian ad litem (GAL) for Jessie. Mullaly recommended that Ann be appointed guardian of Jessie. Ann's attorney drafted the guardianship stipulation, and Michelle and Jeffrey signed it without being represented by legal counsel.

On December 2, 1986, pursuant to the stipulation, the probate court appointed Ann as Jessie's guardian. Approximately one month later, Ann assumed responsibility for the full-time care and custody of Jessie, while Michelle retained visitation rights. This arrangement

was intended to help Michelle improve her financial situation. Michelle testified that she believed initially that the purpose of the guardianship was to allow Ann to make medical decisions for Jessie, to include the child on Ann's medical plan, and to care for her until Michelle could improve her personal and financial situation. The record is unclear as to what occurred between January 1987 and June 1987.

On June 10, 1987, Michelle, without the assistance of counsel, wrote to the probate court seeking assurance that she would be able to continue to visit Jessie. As a result, the court appointed legal counsel to represent Michelle. Michelle and Ann, through counsel, negotiated a stipulation for visitation, which was approved by the court on September 10, 1987. In accordance with the stipulation, Michelle provided Ann with a schedule of the days in September when she planned to visit Jessie. On five of the seven days for which visits had been scheduled, Michelle neither appeared for the visit nor telephoned Ann to cancel or reschedule the meeting. There were no visits scheduled for October 1987. On November 14, 1987, Michelle contacted Ann to arrange six visits with Jessie for the remainder of November. Michelle had two visits with Jessie during mid-November. Ann cancelled the Thanksgiving Day visit because Jessie was ill. Michelle then cancelled the visit for the day after Thanksgiving and did not appear for, or cancel, the final visit, which had been set for November 28, 1987. Ann testified that "as far as the rest of the dates, I don't remember whether or not they were shows or no shows." Ann also testified that she and Jessie moved to Ann's father's house during the summer of 1986, and admitted that Michelle was forbidden from entering the house, so that Michelle would have to wait for Jessie at the end of the driveway. Ann also admitted that she unlisted her telephone number sometime around January 1988 when her father died. After the Thanksgiving cancellation until June 1988, Michelle had virtually no contact with Jessie.

On or about June 16, 1988, Michelle, without notifying her appointed counsel, petitioned the probate court to terminate Ann's guardianship over Jessie. She testified that she acted without her attorney because she felt that her attorney "wasn't really doing her job." In response, Ann petitioned the court to terminate Michelle's parental rights. Thereafter, Michelle's original court-appointed attorney withdrew, and the court appointed a different attorney. The parties' petitions spawned numerous hearings and visitation orders. In August 1988, Richard Mullaly, as GAL, recommended to the probate court that Ann's guardianship continue, and that Michelle's visitation rights continue.

In June 1989, the probate court ordered that visitation between Michelle and Jessie be held in the presence of Rise P., who is Michelle's sister. Rod J., Ann's current husband, became a joint supervisor sometime during or after 1989. Rise supervised between twenty and twenty-five visits. In February 1990, the probate court, responding to complaints filed by Ann, ordered that Michelle "specifically refrain from discussing with Jessie . . . the relationship of herself or any other party with respect to Jessie," and vested the GAL with the authority to suspend visitation. In November 1990, the GAL filed a notice of suspension of Michelle's visitation rights, to which Michelle objected, because she violated the visitation order by discussing her relationship with Jessie. Michelle testified that she did reveal to Jessie that she is her natural mother, but that this occurred before the court order prohibiting such discussion. The probate court upheld the suspension. In May 1991, Michelle, through counsel, filed a motion for a hearing on visitation. A hearing was held on September 25, 1991. On November 1, 1991, the probate court again upheld the suspension of visitation. Pursuant to court order, Michelle has not visited Jessie since the suspension. Ann and Rod wish to adopt Jessie upon the termination of Michelle's parental rights.

None of the court orders required Michelle to contribute toward the financial support of Jessie, nor did Michelle make such financial contributions. The record indicates that Michelle has had limited financial means throughout this period of time, but that her employment situation has improved.

In January 1992, following a hearing on the petitions, the probate court denied Michelle's petition to terminate Ann's guardianship and granted Ann's petition to terminate Michelle's parental rights. This appeal followed.

 The termination of parental rights is a severe measure that divests "the parent and the child of all legal rights, privileges, duties and obligations." RSA 170-C:12; *see State v. Robert H.*, 118 N.H. 713, 716, 393 A.2d 1387, 1389 (1978) ("The loss of one's child can be viewed as a sanction more severe than imprisonment."). The rights of inheritance, however, "shall not be divested until the adoption of said child." RSA 170-C:12. Recognizing parental rights as fundamental under our State Constitution, *see* N.H. CONST. pt. I, art. 2; *Robert H.*, 118 N.H. at 715, 393 A.2d at 1389, this court has held that any party seeking to terminate parental rights "must prove the statutory ground for termination [under RSA chapter 170-C] beyond a reasonable doubt." *Stanley D. v. Deborah D.*, 124 N.H. 138, 142, 464 A.2d 249, 251 (1983). After finding that one of the statutory grounds for

termination has been satisfied, *see* RSA 170-C:5 (1990), "the court must consider whether it is in the child's best interest to terminate the rights of the parent in question." *In re Matthew G.*, 124 N.H. 414, 416, 469 A.2d 1365, 1366–67 (1983).

█ The granting of the guardianship of a minor to a person other than a parent, however, does not irrevocably sever a parent's ties to his or her child. *See* RSA 463:12, :18-a (1992); *see also Lessard v. Company*, 83 N.H. 576, 579, 145 A. 783, 784–85 (1929) (holding that PL 290:18 (1926), current amended version at 463:18-a (1992), does not revoke "all authority of the parent over the child"). When making guardianship appointments, the probate judge may appoint any person nominated by the mother or father "to be guardian of a child, as [the judge] shall think more conducive to the interest of the child." RSA 463:15 (1992). Moreover, when revising a guardianship order, the court makes such "new order or decree as the circumstances of the parents or the benefit of the minor may require." RSA 463:13 (1992). We interpret these statutes to require the probate court to base its decision on the best interest of the child. To the extent that a guardian of the person of a minor is vested with the custody and care of said minor, *see* RSA 463:18-a, I (1992), such guardianship proceedings are analogous to custody determinations pursuant to a divorce, in which the court must determine what is in the best interest of the child. *Cf. Place v. Place*, 129 N.H. 252, 260, 525 A.2d 704, 709 (1987) ("The standard for determining which parent [pursuant to a divorce] should have custody is the best interest of the child."); *see also* RSA 458:17 (1992).

With these standards in mind, we review the probate court's determinations. We first address Michelle's contention that the probate court erred by holding that Ann's continued guardianship would be in Jessie's best interest. We hold that the court neither erred nor abused its discretion in this determination.

There is sparse evidence in the record to support Michelle's contention that it would be in Jessie's best interest to terminate Ann's guardianship. The guardianship stipulation has vested Ann with the custody and control of Jessie since 1986, when Jessie was only six months of age. Jessie is almost eight years old and has known only Ann as her mother. Jessie refers to Ann as "Mom" and to Rod as "Dad," and considers Ann's teenage daughter, Tabatha, to be her sister. *See In re Kristopher B.*, 125 N.H. 678, 684, 486 A.2d 277, 282 (1984) (a strong psychological bond to foster parents may develop after only two or three years). Although Jessie harbors some confusion relative to her relationship with Michelle, she does not consider

Michelle to be her mother and refers to her as "Mickey" or Michelle. Richard Mullaly, Jessie's GAL, testified that Jessie appears secure, happy, and confident in Ann's home, and that she has progressed well in school.

There is evidence to suggest that Michelle has led a stormy existence since at least 1985. Michelle has lived in several different residences and has limited job stability. She has other children from previous unions. Two of the children are no longer in her custody and live with their natural father; there is evidence that she abused these two children. Another child lives with her, and it appears that she has attempted to nurture him to the best of her ability. In January 1992, the court found that Michelle's life was currently stable. She was employed, maintained a positive relationship with her boyfriend, and conscientiously cared for her young son.

■ Based on a review of the record, we hold that the court did not abuse its discretion in finding that Ann's continued guardianship would be in the child's best interest.

■ We next address Michelle's contention that the probate court erred by holding that Ann proved beyond a reasonable doubt that Michelle intended to abandon Jessie. We will not disturb the probate court's decision "unless it is unsupported by the evidence or plainly erroneous as a matter of law." *In re Lisa H.*, 134 N.H. 188, 191, 589 A.2d 1004, 1006 (1991). It is not clear from the probate court's order whether it applied the proper analysis in finding abandonment. We, therefore, vacate and remand for a new hearing on this issue.

Focusing on the six-and-one-half month period between November 1987 and June 1988 in which Michelle did not communicate with or support Jessie, the probate court found that Michelle abandoned Jessie under RSA 170-C:5, I. The court stated:

"Ann . . . offered testimony that there was no contact or support from Michele [*sic*] E to herself or the minor child from the end of November, 1987 until approximately June 16, 1988. This is corroborated by the Guardian ad litem . . . , who testified that Michele [*sic*] told him during an interview in approximately June of 1988 that the last time she had seen Jessie was at Thanksgiving. Michele [*sic*] E's testimony was confusing and contradictory regarding this time period. At one point, she stated she had visited with Jessie during this period, but also testified that she hadn't because she was prevented from visiting by Ann [J.].

Based upon the testimony offered with respect to the Petition to Terminate Parental Rights, the petitioner has

> proven beyond a reasonable doubt that the respondent, for a period in excess of six months as alleged in the petition, abandoned the child, pursuant to RSA 170-C:5 I. Further, it is proven beyond a reasonable doubt that a termination would be in the best interests of the child." ·

Although the record is replete with conflicting testimony as to why Michelle did not visit Jessie between late November 1987 and June 1988, a reasonable person could find beyond a reasonable doubt that there was no communication during this time period. *See In re Sara S.*, 134 N.H. 590, 593, 593 A.2d 1166, 1168 (1991). We, therefore, defer to the probate court's finding on this issue.

■ The finding of no communication for a period of at least six months, however, is only a first step in finding abandonment under RSA 170-C:5, I. By its terms, RSA 170-C:5, I, creates a rebuttable presumption that a parent intends to abandon the child if the parent has left the child in the care and custody of another without provision for the child's support or without communicating with the child for a period of at least six months. *See In re Jessica B.*, 121 N.H. 291, 295, 429 A.2d 320, 323 (1981); *see also* Kfoury, *Termination of Parental Rights in New Hampshire*, 23 N.H.B.J. 3, 4–5 (1981). RSA 170-C:5, I, provides:

> "It shall be presumed that the parent intends to abandon the child . . . who has been left by his parent in the care and custody of another without any provision for his support, or without communication from such parent for a period of 6 months. If in the opinion of the court the evidence indicates that such parent has made only minimal efforts to support or communicate with the child, the court may declare the child to be abandoned."

The six-month period during which there is no communication or support by the parent serves as a triggering mechanism for the finding of abandonment, but does not mandate such a finding. *See In re Jessica B.*, 121 N.H. at 295, 429 A.2d at 323. The parent opposing termination has the opportunity to rebut the presumption of intent to abandon, *see id.*, by offering evidence of events that occurred before, during, and after the triggering period. The court should consider the totality of the evidence to determine if the parent intended to abandon the child.

■ Although the statute does not provide a definition of abandonment, we have held that "[a] parent abandons his child when his

conduct evidences a settled purpose to forego all parental duties and relinquish all parental claims to the child." *In re Sara S.*, 134 N.H. at 592, 593 A.2d at 1168 (quotations omitted). "A court may declare a child abandoned if it finds objectively that the parent has made only minimal efforts to support or communicate with the child." *Id.* at 593, 593 A.2d at 1168 (quotations and brackets omitted). Moreover, a mere "flicker of interest" is not sufficient to rebut the presumption of abandonment. *Id.*

■ Here, the probate court found that "the petitioner [had] proven beyond a reasonable doubt that the respondent, for a period in excess of six months as alleged in the petition, abandoned the child." We are unable to determine, however, whether the probate court considered the totality of the circumstances or only the six-and-one-half-month period alleged in the petition to find abandonment. Hence, it is unclear whether the probate court applied the proper legal analysis. Consequently, we vacate and remand to the probate court for a new hearing to determine whether Ann has proven beyond a reasonable doubt, considering the totality of the circumstances, that Michelle intended to abandon Jessie.

*Affirmed in part; vacated in part; and remanded.*

All concurred.