Hillsborough County Probate Court
No. 94-878

*In re* ANGEL N.

July 2, 1996

*Elizabeth Cazden*, of Manchester, by brief and orally, for Kathleen B.

*Law Offices of Randall E. Wilbert*, of Nashua (*Andrew D. Wickwire* on the brief and orally), for Richard N.

*Jeffrey R. Howard*, attorney general (*Martin P. Honigberg*, assistant attorney general, on the brief and orally), for the State.

BRODERICK, J. The Hillsborough County Probate Court (*Cloutier*, J.) granted the petition of the State Division for Children, Youth, and Families (DCYF) to terminate the parental rights of Kathleen B. (Kathleen) and Richard N. (Richard) over their daughter, Angel N. (Angel). The parents appeal independently. We affirm.

Angel was born on March 11, 1989. Because of previous history involving Kathleen and DCYF and concerns expressed by hospital personnel about the parents' conduct, DCYF provided a visiting nurse and a social worker as daily support to the family once Angel was brought home from the hospital. Despite the early assistance, when Angel was two weeks old, her mother reported to DCYF that she and Richard had been fighting and that Richard had dropped Angel into her bassinet.

As a result, DCYF filed neglect petitions against both parents in the Nashua District Court. Both parents consented to the neglect petitions. DCYF obtained legal custody of Angel and placed her in temporary foster care.

After five days, Angel was returned to her mother, who was then separated from Richard and sharing an apartment with another man. Thereafter, DCYF provided both parents with outpatient counseling, parenting classes, and transportation.

In apparent disregard of a restraining order allowing Richard and Kathleen to have "peaceful contact" outside Angel's presence, Kathleen and Richard had yet another altercation in Angel's presence in downtown Manchester on July 25, 1989. After Richard ran from the scene, several witnesses observed Kathleen strike Angel on her head and back, causing red welts. The police officer dispatched to the scene reported that Kathleen asked him to "find someone to take the baby" because she could not properly care for her. DCYF, which still retained legal custody, once again placed Angel in foster care.

During this separation, DCYF continued to provide support services to both Kathleen and Richard. Reports to the district court during this period revealed that Kathleen displayed "[u]ncontrolla-

ble outbursts and mood shifts"; that "[w]hile she may comply with [court-ordered therapy], it appears she would be 'going through the motions', resisting change and cognitively unable to benefit much from therapy"; that although she had "made some gains," she had "much further to go before the prospect of reuniting her with Angel occurs"; and that she needed "further help in dealing with increased or unpredictable stress." Similarly, reports on Richard's progress noted that he had not consistently exercised good judgment during visitations with Angel, that he "resumed drinking and stopped keeping his appointments and fulfilling his responsibilities in general," and that "[o]verall, Richard does not at this time appear a realistic candidate for indep[e]ndent care of his daughter."

DCYF continued its goal that Angel be returned to her mother. Visitation was increased and decreased based on Kathleen's and Richard's behavior. Although the district court ordered that both Kathleen and Richard "maintain a stable home," both continued to move frequently.

Angel was reunited with Kathleen on August 26, 1991, after more than two years of separation. The reunion was short-lived. On September 23, 1991, following a physical assault on Kathleen by her male roommate in Angel's presence, Kathleen agreed that her daughter should return to foster care. On October 16, 1991, after Kathleen secured a "stable and appropriate residence," DCYF returned Angel to her care once again.

One month later, Kathleen and Richard were involved in yet another violent altercation in Angel's presence. The argument culminated in Kathleen stabbing Richard in the arm with a steak knife. For the fourth and final time, Angel was placed in foster care.

DCYF continued to provide parenting classes and counseling; progress was slow. The underlying theme in reports to the district court was that it was "too soon" to consider reunification, even though DCYF had been working with the parents for more than three years with no demonstrable improvement.

In early 1992, Kathleen was counseled to "stay away from" her abusive relationships with Richard and her male roommate; nevertheless, she lived twice with Richard and twice with the male roommate, notwithstanding the assaults that resulted in Angel's third and fourth foster care placements.

The district court continued to review their progress. It noted that both Richard and Kathleen were awaiting the outcome of felony proceedings for theft in the superior court, for which Richard was later sentenced to six months in the house of correction. The court also acknowledged the concern of Angel's counsel that Richard and

Kathleen "have a long history of short-term improvement which deteriorates into long-term problems," and his fear that their past pattern of behavior would be repeated. Reports to the district court noted once again that Richard and Kathleen needed "continued services to learn parenting skills and anger management," and "additional time to reach their goals."

In July 1993, Richard and Kathleen had three altercations. The first was an incident of kicking; two additional fights involved hitting, punching, and choking. The district court responded that these events "raise continued concerns about the wisdom of having. Angel returned home to her parents." The court continued:

> The parties['] . . . progress is unavoidably slow, which operates to the detriment of Angel since the court is unable to reach the statutory and regulatory objective of providing a permanency plan within a time frame which is appropriate for Angel's welfare. The court has no specific calendar date on which it intends to make a final decision. However, the passage of time is alone becoming an issue, and the progress of the parties will be watched very closely in the ensuing months. If sufficient progress is not achieved, the court would expect [DCYF] to pursue its sometime objective of termination of parental rights.

In early 1994, DCYF petitioned the probate court to terminate Kathleen's and Richard's parental rights. Following four days of hearings, the probate court found beyond a reasonable doubt that Richard and Kathleen had failed to correct the conditions leading to the neglect finding within eighteen months and terminated their parental rights. *See* RSA 170-C:5, III (1994). These appeals followed.

Our standard of review is statutory: "The findings of fact of the judge of probate are final unless they are so plainly erroneous that such findings could not be reasonably made." RSA 567-A:4 (Supp. 1995). Consequently, "[w]e will not disturb the probate court's decree unless it is unsupported by the evidence or plainly erroneous as a matter of law." *In re Sheena B.*, 139 N.H. 179, 181, 651 A.2d 7, 9 (1994).

Kathleen first argues that the termination order was tainted by erroneous factual findings. She maintains that one of her children who was previously given up for adoption was not "from a prior marriage." We agree that this statement is inaccurate. That the probate court erred in reciting part of her personal history, however, does not support her contention that it "relied" on this misstatement in its determination. The probate court's articulated

basis for granting the termination petition was devoid of any reference to Kathleen's other children. *See State v. Jones,* 133 N.H. 562, 564, 578 A.2d 864, 865 (1990).

Kathleen also points to the factual error regarding her eleven-year-old son, Joshua. The probate court stated that Joshua "was placed in a foster home in 1985 and custody was thereafter given to his biological father." This statement, although true, is incomplete. In June 1994, DCYF returned Joshua to Kathleen's custody. She contends, therefore, that DCYF's determination that she is capable of parenting Joshua "creates more than a reasonable doubt" that she was incapable of adequately parenting Angel. We disagree.

The reason for Joshua's return to Kathleen is telling. The DCYF case worker testified that "[h]is father was arrested for molesting five boys . . . [and] is now incarcerated and there [were] no other available relatives." Although return of Joshua to Kathleen may not have been ideal, "this is not an ideal world." *State v. Robert H.,* 118 N.H. 713, 718, 393 A.2d 1387, 1390 (1978).

■ We are not persuaded by the argument that one who can adequately parent one child is equally and automatically capable of parenting another. *See, e.g., In re Tricia H.,* 126 N.H. 418, 419–20, 493 A.2d 1146, 1148 (1985). The strains on a parent's resources — personal as well as financial — caused by the introduction of another child into the home are obvious. A DCYF caseworker testified that Angel was "definitely" more challenging to parent than Joshua. Another noted that Joshua was older, more intelligent, and more self-sufficient. Kathleen had five years to demonstrate her ability to provide baseline parenting to Angel. She failed. Joshua did not cause her deficiencies and would not likely cure them. Consequently, the court's determination that Kathleen was not capable of caring for Angel, even though it heard testimony that she was caring for Joshua, was not error.

Kathleen next argues that the probate court erroneously terminated her parental rights for failing to correct her unstable housing. In *Robert H.,* we held that less than ideal parenting, particularly when it is caused by poverty, is an insufficient basis for terminating parental rights. *Robert H.,* 118 N.H. at 719, 393 A.2d at 1391. Rather, the State must prove that the parent has "failed for as long as eighteen months to rectify the conditions of neglect, despite the court's attempts to promote their correction." *In re Tricia H.,* 126 N.H. at 425, 493 A.2d at 1151. Here, the probate court relied on more than Kathleen's unstable housing in ordering termination. The neglect found and not corrected in this case was not due to economics. It related largely to a fundamental lack of parenting

skills and concern for Angel's welfare. While Richard and Kathleen suffered scars from difficult lives, the court could not ignore Angel's neglect merely because the people responsible for her welfare and safety were burdened with many of life's disadvantages.

■ Kathleen lastly argues that the evidence was insufficient to support termination. The probate court was required to assess Kathleen's efforts to rectify the conditions leading to the neglect finding during the eighteen months following that finding. *See* RSA 170-C:5, III. Here, as in a termination of parental rights premised on abandonment, the court also considered events that occurred beyond the eighteen-month period to determine whether DCYF had proven the statutory grounds for termination beyond a reasonable doubt. *Cf. In re Jessie E.*, 137 N.H. 336, 342, 627 A.2d 591, 595 (1993).

Even though no documented violence between Kathleen and Richard occurred for several months after the November 16, 1991, stabbing, during this time frame Kathleen "trashed" Richard's room at his mother's home; got so upset at being asked to leave Richard's mother's home that she scratched her face, leaving red welts; and associated with a "known sex offender." This "violence-free" period was then followed by the three incidents in July 1993 — involving kicking, hitting, punching, and choking.

Although Kathleen was benefiting from the therapy provided by the district court, improvement alone is not sufficient. "[W]hile parental improvement is a factor to consider, the real test is whether there is a reasonable possibility of reuniting parent and child within a reasonable period of time." *In re J.J.*, 458 A.2d 1129, 1131 (Vt. 1983); *see also In re Diana P.*, 120 N.H. 791, 798, 424 A.2d 178, 182 (1980), *cert. denied*, 452 U.S. 964 (1981).

Additionally, only Kathleen's therapist, who acknowledged that her "sympathy lies with" Kathleen, testified that even though Kathleen had "a distance to go," Angel could be returned to her care. No one else suggested that Kathleen had improved to such an extent that returning Angel to her custody was reasonable or likely. It is within the probate court's sound discretion to evaluate credibility; we find no error in the court's determination. *See Society Hill at Merrimack Condo. Assoc. v. Town of Merrimack*, 139 N.H. 253, 256, 651 A.2d 928, 930 (1994).

We next address Richard's appeal. *See* RSA 170-C:11, III (1994); *In re Doe*, 123 N.H. 634, 643, 465 A.2d 924, 930–31 (1983) (termination of each parent's rights independent). Richard first argues that the probate court put undue weight on "the best interest of the child" in terminating his parental rights.

The probate court performs a two-step analysis when it considers a petition to terminate parental rights. First, it must find one of the statutory grounds for termination; thereafter, it must determine whether termination would be in the best interest of the child. *In re Jessie E.*, 137 N.H. at 339–40, 627 A.2d at 593. The termination order discloses that the probate court acted appropriately. After reciting the factual basis of its "failure to correct" determination, the court noted Angel's special needs and the ability of her foster parents, who intend to adopt her, to meet those needs. We find no error in the probate court's analysis.

Insufficiency of the evidence is Richard's second argument. As in Kathleen's appeal, the factual underpinnings for the court's decision are lengthy. Richard made little progress through counseling and parenting classes. His violent relationship with Kathleen was ongoing. The probate court found that he was "also deficient in his stress tolerance and empathy in judgment." Although DCYF had at one time hoped to reunite Angel with both parents, it ultimately abandoned that plan. We find ample support in the record for termination.

Richard lastly argues that the probate court erroneously relied on his physical limitations and drug abuse in ordering termination. A review of the record reveals no such reliance. Although the probate court noted Richard's personal difficulties, it based its termination decision on its assessment that the conduct between the parties had not changed and that it could not expect "any substantive changes in the future whereby their conduct [or] action can become violent at any time and the child would be at risk."

Although the law should not attempt to micromanage families, society does have a right to insist that children not be neglected. When neglect is due to a parent's unwillingness or reluctance to assume basic responsibilities, then society has a right to interfere to protect the innocent child. In an effort to save and nurture the unique bond between parent and child, the State, in the first instance, should take reasonable and appropriate steps whenever possible to assist in maintaining the legal link between parent and offspring. In the case at hand, the State took such steps over a period of approximately five years. The parents failed to respond as required. Regrettably, they acted or failed to act at their peril. Neglect cannot and will not be tolerated.

*Affirmed.*

JOHNSON, J., concurred in part and dissented in part; the others concurred.

JOHNSON, J., concurring in part and dissenting in part:

Because I believe that the relationship between parent and child is nearly inviolable, and should be torn asunder only on exceptional facts, I respectfully dissent with respect to the termination of Kathleen's parental rights. The facts of this case do not support the trial court's decision with respect to Kathleen. I concur, however, in the majority's holding regarding Richard, the father.

Focusing on Kathleen, she has two children — Joshua and Angel. DCYF has found her fit on the one hand to have the care and custody of Joshua, but on the other hand has advocated that her maternal relationship with Angel be severed for all time. This is incomprehensible to me. If Kathleen is fit to be the primary care provider of Joshua with the full support of DCYF, then she is certainly fit to have the opportunity to parent Angel in the future.

This is not to say that the foster parents of Angel, *at this time*, are not better prepared to parent Angel. Unquestionably, they are. But this could be said of thousands of children in our State; that is, that other potential adoptive parents could better parent a particular child than the natural parents *at this time*. The real question, put simply, is, should the natural parents of Angel be deprived of their parental rights because DCYF has now found "better parents" to care for Angel? The mere fact that Joshua was a boy of twelve and Angel was a girl of five certainly did not render Kathleen fit to care for and nurture Joshua, and unfit to care for and nurture Angel.

Is Kathleen beyond hope to parent Angel? The record would indicate that she is not. On July 7, 1994, a psychologist wrote the Nashua District Court as follows: "[Kathleen] has shown she warrants an opportunity to maintain physical custody of her son, Joshua []. She has participated in family therapy sessions here and has demonstrated that she can be effective as a parent." On August 22, 1994, he wrote further:

> Kathy has demonstrated good judgment and consistency with her son. She has, to date, kept her anger under control, a concern DCYF had about her ability to parent. . . .

> Kathy and Joshua are seen weekly in order to ensure that this living arrangement goes well. Kathy continues to be forthright and cooperative in the counseling sessions[.] She seems genuinely committed to parenting Joshua. I continue to support the present situation and do not make any further recommendations at this time.

Kathleen's own therapist, called as a witness for the State, also testified that, based on Kathleen's successful parenting of Joshua, she could parent Angel. She testified as follows:

Q. You say in the end that her, meaning Kathy, abusive past has kept her from being the mother and person she truly can be. Do you mean to say that with treatment, she will be what she could have been?

A Yes. I believe that behind all the . . . Kathy at core is a very sweet woman and a very trusting woman, that's her core personality, that's her natural personality. Not everyone is such a sweet person, but she really is. At heart, a compassionate, nice person. I think everyone likes her and I think if she had been born in another home or certainly with treatment, that woman is coming out. That is her true personality. I think a lot of the anger stuff is really defenses that are not part of . . . she is not an angry person in the core.

Q So you when you say last, "With some treatment, the fog is beginning to lift and she is becoming a capable, functional human being," you mean that she has reached at least the minimal levels of being a capable, functional human being and simply has place to go?

A That's correct.

Q She still can improve?

A She certainly can. I'm not saying that Kathy is cured, but I am saying that she has made significant progress.

Q So the conclusion that we draw, at least that I'm drawing from your testimony, is that were Kathy to be provided with services from the Division, at least to the extent that they have provided services up till now, during the period of the reunification, in other words, if they didn't just give back the kid and say here, hang yourself, fail, but if they actually perform their job which is to provide services to a needy person, they would be able to provide services to a needy family, which would include Kathy and Joshua and Angel, is that true?

A That's correct.

Q And you believe that if this case were dismissed today, Kathy went home and picked up Angel or at least there was a reasonable transition, that Kathy would be able to succeed.

A That's correct.

Q   Provided there were services.

A   Provided there were services.

Q   We can't tell how long these services need to be in place, but a[s] long as they're in place, there would be success, is that correct?

A   I believe there would be.

Q   Would it be safe to say that at some point, the services wouldn't be needed anymore, as Angel got to be six or seven, as Joshua got to be a little older, as Kathy made more progress in treatment?

A   If she continues to make the progress that she's made within the six months to the next six months, and then probably the case could wind up within a year, a year and a half.

Q   Being closed all together?

A   That's correct.

Kathleen's therapist also testified:

Q   . . . [Kathleen's] been involved with and dependent upon quote, you said the system. Has she been victimized to some degree by DCYF in this case?

. . . .

A   I think rather than victimized, I would like to say I think the case from ground one, which I was not involved with nor I believe any of the principals here, so I can speak more freely without hurting feelings, has mismanaged the case. Their idea really was not to give her the kinds of . . . they didn't understand the kinds of services she needed to appropriately parent, that was number one. They didn't return Angel or terminate her rights in a timely manner. And in fact, as it has ended up, has both victimized her, Angel and themselves in terms of really management. I think it's a total mismanagement that has gone on for years because most children are not left until four or five to be decided what their fates are, and then [wre]nched away from their parents.

Q   And by the same token, most parents are not strung along for four or five years?

A   I can't see what that would be like, of waiting to get your

child back for that amount of time, so, yes, in that term, that certainly is victimization.

Based on this record, it is a tragedy to terminate Kathleen's parent-child relationship with Angel for all time.