Hillsborough County Probate Court
No. 2007-294

## IN RE GUARDIANSHIP OF PHUONG PHI THI LUONG

Argued: April 10, 2008
Opinion Issued: July 2, 2008

*John D. MacIntosh, P.C.*, of Concord (*John D. MacIntosh* on the brief and orally), for the petitioners.

*Ransmeier & Spellman, P.C.*, of Concord (*John C. Ransmeier* on the brief and orally), for the respondent.

DUGGAN, J. The petitioners, the guardians of Phuong Phi Thi Luong, appeal orders of the Hillsborough County Probate Court (*Patten*, J.) rejecting two estate plans they proposed for Phuong Phi Thi Luong pursuant to RSA 464-A:26-a (2004) and adopting an alternative estate plan drafted by a court-appointed referee. We hold that the probate court was within its discretion to reject the estate plans proposed by the petitioners, but find that the court went beyond its authority in adopting the estate plan drafted by the court-appointed referee. Accordingly, we affirm in part, reverse in part, and remand.

*I. Factual and Procedural Background*

The record reveals the following facts: Phuong Phi Thi Luong (Phi) is a forty-four year old woman who was born in Vietnam and immigrated to the United States in 1994. In 2000, she married the respondent, William Walker, and, approximately one year later, gave birth to her only child, Catherine. In approximately 2002, Phi and Walker filed for divorce and Phi obtained temporary custody of their daughter.

On February 17, 2003, while her divorce to Walker was still pending, Phi suffered irreparable brain damage during the course of elective surgery. As a result, she is now in a persistent vegetative state. Although she is able to breathe on her own, she is unresponsive to stimuli and must be fed artificially. Because she is unable to care for herself, she now resides at a facility where she can receive daily life-sustaining care.

Following Phi's incapacitation, her youngest brother, Tan Luong, was appointed her sole guardian. As guardian, Tan Luong initiated a medical malpractice action on Phi's behalf and, on September 8, 2003, filed a petition with the probate court requesting to have a will approved for Phi's estate. *See* RSA 464-A:26-a, III. Pursuant to Tan Luong's proposed will, Phi's residuary estate would have been divided equally among Phi's parents, a trust in Catherine's name, and Phi's siblings, including Tan Luong. Walker, who had obtained custody of Catherine through finalization of Phi and Walker's divorce, objected to Tan Luong's proposed will in his capacity as Catherine's natural guardian. The probate court then appointed a guardian *ad litem* to represent Catherine's interests in the matter.

However, before the probate court could consider Tan Luong's petition, the attorney representing Phi in the civil suit, Mark A. Abramson, filed a motion requesting that Tan Luong be removed as guardian and a disinterested successor guardian be appointed. In that motion, Abramson asserted that he had obtained a substantial settlement offer from the defendants in

Phi's suit, and that, "in spite [of] the fact that he has no legal right to any of the proceeds of the civil suit, . . . [Tan Luong] refuses to authorize settlement because he wishes to obtain personal monetary benefits to which he is not entitled." In addition, Abramson stated that Tan Luong "refused to authorize settlement in an effort to force [Phi's] ex-husband to agree that he, his siblings, and his parents are entitled to portions of the proceeds."

The probate court never ruled upon Abramson's motion. Instead, a stipulation was submitted to the court that permitted Tan Luong to select an attorney—to be approved later by the probate court—to serve as co-guardian. In accordance with that stipulation, Tan Luong interviewed attorney Joseph E. Mitchell for nearly two hours and, on June 23, 2004, filed a motion to have him appointed as Phi's co-guardian. The probate court approved the motion on July 7, 2004. With the addition of Mitchell as co-guardian, the civil suit was finally settled, resulting in a net realization of $4,964,823.31 to Phi's estate.

On October 7, 2004, Phi's guardians filed a new petition with the probate court "request[ing] that the court accept and approve" a revised estate plan. Unlike the estate plan submitted earlier by Tan Luong, the revised estate plan provided that, upon Phi's death, a cash bequest of $400,000 would automatically be made to a trust in Catherine's name. Tan Luong was named the sole trustee of the trust and would have had discretion to use "any income and principal [of the trust] for the support, education and care of Catherine." Catherine would be entitled to all of the trust assets once she reached the age of twenty-five. However, if she passed away before reaching the age of twenty-five without issue, all of the trust assets would go to Phi's parents and siblings. The residue of Phi's estate was allocated as follows: (1) forty percent to Phi's parents; (2) twenty percent to Phi's siblings, including Tan Luong; and (3) an additional forty percent to Catherine's trust.

Walker objected to the guardians' revised estate plan and filed a notice of appearance. Catherine's guardian *ad litem* joined in Walker's objection. Accordingly, the probate court held a four-day hearing to consider evidence concerning the guardians' petition. During those proceedings, the guardians submitted testimony from two Vietnamese attorneys in an attempt to demonstrate that the distributions provided for in the revised estate plan were "consistent with the cultural background, values and beliefs of citizens of Vietnamese origin." Moreover, they solicited testimony from two of Phi's acquaintances, and submitted evidence of prior gifts Phi had made to her parents and siblings, in an attempt to demonstrate that Phi would have adhered to those Vietnamese values in making her testamentary bequests.

On October 19, 2005, the probate court issued an order rejecting the guardians' revised estate plan. The court ruled, among other things, that the preponderance of the evidence did not demonstrate that the revised will either minimized taxation on Phi's estate or provided for bequests that Phi would have made had she not been incapacitated. *See* RSA 464-A:26-a, I (explaining that, where a ward's wishes cannot be ascertained, the probate court may authorize the guardian to develop an estate plan to "minimize taxation or to facilitate distribution of the ward's estate to family, friends, or charities who would be likely recipients of gifts from the ward"). More specifically, the court stated:

> The ward never made a will and never discussed her intentions, if she had formulated any before he[r] incapacity, regarding her desire to benefit her daughter, her parents or her siblings upon her death, and if so, in what proportions. As much as she was culturally attuned to her ethnic heritage, so too, she was a citizen of the U.S., living and working in the U.S. for many years, and part of the cultural fabric of the United States . . . .

> As to the testamentary distribution plan being proposed, it was developed without any clear, specific understanding of the tax impact on the ward, or the present and potential impact on the beneficiaries of the ward under the plan, at present or potentially in the future. Further, the propose[d] distribution plan was apparently prepared without a determination of the present and potential future support obligations of the ward to her daughter being established and calculated, particularly in reference to the ward's unique circumstances and long term medical needs. . . .

> On all this evidence, the preponderance is found to be against the specific testamentary distribution plan for the ward reflected in the terms of the will being offered for approval by the Court. This evidence may well support some nature, amount and manner of distribution to the parents and siblings of the ward, to generally reflect cultural norms and traditions, as well as to the ward's only child, but the weight of and preponderance of that evidence presented would be against the percentages and manner in which the proposed distributions would be made in this case.

The court concluded its order by stating that, although it was rejecting the guardians' revised will, the parties were "invited to further consider all important additional information to be obtained, as well as the many alternatives available and perhaps agree to a restatement of all of these considerations in a further proposed distribution plan for approval by the court."

Two months later, in an order resolving a matter unrelated to the present dispute, the court acknowledged that it had been "advised that the guardians ha[d] hired counsel to prepare a comprehensive estate plan for [Phi] in response to the Court's rejection of the previously proposed will," and that Walker had expressed concern that this new plan would also face opposition. Therefore, presumably in anticipation of another dispute, the probate court ordered the guardians to submit a copy of their final plan to the court and all interested parties within sixty days; ordered all parties who opposed the guardians' final plan to submit an alternative plan to the court within forty-five days after receipt of the guardians' plan; and scheduled a status conference to resolve the matter. In addition, the court explained that it intended to appoint a referee to review the plans submitted by the parties and, if a consensus could not be reached from the proposals presented, "to establish a specific estate plan for [Phi] and submit the same to the [c]ourt for approval and implementation." On March 14, 2006, the court appointed attorney Sally Mulhern to fill this referee role and "act as an arm of the court."

On April 20, 2006, the guardians filed a petition requesting that the probate court approve their final estate plan. That plan provided for up to $1,000,000 in lifetime gifts out of Phi's estate, of which 47.5% was to be distributed to Catherine in trust, 47.5% to Phi's parents outright, and 5% outright to those of Phi's siblings who reside in Vietnam. The plan also included a will for Phi, which provided for bequests, upon her death, of her residuary estate in the following manner: (1) 45% to Catherine in trust, if she had not attained the age of thirty-five, and outright, if she had; (2) 45% to Phi's parents if they were still alive or, if they were not, then to Phi's siblings, *per stirpes*; and (3) the remaining 10% to Phi's siblings, *per stirpes*.

The trust created for Catherine in this plan was different from the one attached to the guardians' revised estate plan in several respects. First, it provided for disbursements when Catherine reached the ages of twenty-five, thirty, and thirty-five. In addition, Catherine was to have a general testamentary power of appointment over her trust once she reached the age of twenty-five. However, if she passed away before reaching that age, or if she died without having exercised her "power of appointment, the remaining principal and undistributed income [of her trust] would be distributed to [her] then living descendants by right of representation, or, if [she had none], . . . then one-half in equal shares to Phi's parents and one-half to the descendants of Phi's parents by right of representation." Finally, unlike in the prior plans, the guardians' final estate plan explicitly provided that any portion of Phi's estate that would be distributable to Tan

Luong "shall be distributed instead to the Buddhist Temple in Manchester, or if that Temple is not in existence or declines the gift, then to New Hampshire Legal Assistance."

Both Walker and Catherine's guardian *ad litem* opposed the guardians' final estate plan. In his objection, Walker pointed out that the increase in Catherine's share under the guardians' final will to 45%, from the 40% proposed in the previously rejected revised estate plan, was *de minimis* and "offset by the fact that the proposed $1 million gift secures for members of [Phi's] family an immediate gift of $525,000 that they would not have enjoyed under the [revised estate plan] that the [probate c]ourt disapproved as being too favorable to them." Therefore, Walker argued, the probate court should reject the guardians' final estate plan because it "represent[ed] no material change in the relative economic interests of Phi's daughter and the other members of [Phi's] family" from the revised estate plan the court had already rejected in its October 19, 2005 order.

On June 6, 2006, the probate court held a status conference and ordered Mulhern to "review all relevant matters and develop an estate plan for the ward." The court further stated that it would schedule a hearing, after receiving Mulhern's plan, in order to consider "the plan developed by . . . Mulhern, the guardians['] proposed plan, and [any] plan offered by" Walker.

The probate court, however, did not hold another hearing. Instead, on March 28, 2007, the court issued its final order and adopted the plan prepared by Mulhern "as being consistent with all of the statutory requirements under [RSA 464-A:26-a, V(a)-(d)], and consistent with the best interests of the ward." In summary, the plan submitted by Mulhern: (1) eliminates any gifts or bequests to Phi's siblings; (2) provides for the funding of a discretionary special needs trust for Phi's parents of up to $200,000, assuming that Phi's estate exceeds $2,000,000 at her death; and (3) bequeaths the remainder of Phi's estate in trust to Catherine and Catherine's descendants. After adopting that plan, the court instructed Mulhern to prepare a final draft and ordered the parties to sign the same or else "the documents w[ould] be signed by the referee under the authority conferred on her . . . by virtue of this order."

On appeal, the guardians argue that the probate court erred by: (1) adopting the estate plan prepared by the court-appointed referee; and (2) ignoring the weight of the evidence, which they submit compels the conclusion that both of their proposed estate plans were in compliance with RSA 464-A:26-a. We address each of the guardians' arguments in turn.

*II. Adoption of the Referee's Estate Plan*

The guardians argue first that the probate court erred in adopting the estate plan drafted by the referee. Specifically, they contend that, "[w]hatever concerns the probate court may have had with the[ir] plan, it is clear from [RSA 464-A:26-a, I,] that [the court] did not have the authority to delegate th[e] responsibility [of drafting an estate plan] to a third-party 'referee'." Instead, they assert, the court's authority under the statute "is limited to either approving or disapproving the guardians' plan."

Resolution of the guardians' argument requires interpretation of the language of RSA 464-A:26-a. When interpreting the language of a statute, we ascribe the plain and ordinary meaning to the words used and discern the legislative intent from the statute as written. *State v. Doyle*, 156 N.H. 306, 308 (2007). We will not consider what the legislature might have said, or add language that the legislature did not see fit to include. *Id.* When the language of a statute is plain and unambiguous, we do not look beyond it for further indication of legislative intent. *Franklin v. Town of Newport*, 151 N.H. 508, 509 (2004). However, we are the final arbiters of the legislature's intent as it is expressed in the words of a statute when considered as a whole. *Doyle*, 156 N.H. at 308.

■ The legislative intent of RSA 464-A:26-a is clear on its face. Apart from entitling the statute "Estate Planning by Guardian," the legislature clearly demonstrated that it is the guardian's responsibility to draft the ward's estate plan by stating that "[t]he probate court may authorize the *guardian* of the estate to plan for the testamentary distribution of the ward's estate." RSA 464-A:26-a, I (emphasis added). Even in cases such as this one, where the ward's wishes cannot be ascertained, the legislature again chose to limit the probate court to "authoriz[ing] the guardian" to draft a plan that will "minimize taxation or . . . facilitate distribution of the ward's estate to . . . [those] who would be likely recipients of gifts from the ward." *Id.* Although the probate court has the ultimate discretion of approving or disapproving a submitted plan, *see* RSA 464-A:26-a, I, II, V, nothing in the statute permits the court to use a referee to draft a plan. Therefore, we hold that RSA 464-A:26-a places the burden of drafting the ward's estate plan, if one is to be drafted, upon the guardian.

The respondent argues, relying exclusively upon RSA 547:3-b (2007), that we must nevertheless affirm the probate court's adoption of the referee's estate plan as a valid exercise of the court's equity authority. He asserts that the court was within its "equity jurisdiction to fashion a remedy . . . because the otherwise available procedure for preparing a will for Phi had proved to be plainly inadequate."

Although RSA 547:3-b bestows upon the probate courts "the powers of a court of equity in cases in which there is not a plain, adequate and complete remedy at law," we do not agree that that equity authority can be exercised in circumvention of the express language of RSA 464-A:26-a, which places the responsibility of drafting an estate plan upon the guardian. Moreover, we disagree with the respondent's implicit assertion that there was no other "plain, adequate and complete remedy at law" than adoption of the referee's plan. RSA 547:3-b; *see also Thurston Enterprises, Inc. v. Baldi*, 128 N.H. 760, 764 (1986) (explaining that "equitable jurisdiction lies only when there is no plain and complete remedy at law"). RSA 464-A:26-a does not require that an estate plan be drafted for all incapacitated individuals and, assuming that one is not adopted in this case, the legislature has already provided what it deems to be a complete and adequate remedy for dealing with such a situation in the intestacy statutes. *See* RSA 561:1, II(a) (2007) (providing that, in a case such as this, "the entire intestate estate . . . passes . . . [t]o the issue of the decedent").

If the probate court believes that the guardians are not acting in the best interests of the ward or have a conflict of interest, it may consider whether they should continue to serve in that capacity. *See* RSA 547:3, I(e) (2007) (granting probate judges exclusive jurisdiction to "appoint[] and re- mov[e] . . . guardians of . . . mentally incompetent persons"); *see also* RSA 464-A:26-a, VI (explaining that "[t]he probate court, prior to authorizing a lifetime gift, shall appoint a guardian ad litem if the proposed gift benefits the guardian personally or otherwise creates a potential conflict of interest between the ward's interests and the guardian's personal interests"). But, the court cannot appoint a referee to independently draft an estate plan when the express language of RSA 464-A:26-a clearly makes it the guardians' responsibility. We, therefore, hold that the probate court erred in adopting the estate plan drafted by Mulhern.

### III. Rejection of the Guardians' Proposed Estate Plans

The guardians argue next that the probate court erred in rejecting both their revised and final estate plans. Before reaching this argument, however, we must first address a preliminary matter. In his brief, Walker argues that the probate court's October 19, 2005 order rejecting the guardians' revised estate plan was a "decision on the merits," subject to mandatory appeal under Supreme Court Rule 7. Because the guardians failed to appeal that order, Walker asserts that their current appeal is untimely insofar as it pertains to the revised estate plan. The guardians, in contrast, argue that the October 19, 2005 order was not a decision on the

merits because it rejected their revised will only "in part" and further "directed the parties to meet and formulate [another] will for [the] court['s] consideration."

Pursuant to Supreme Court Rule 7(1), an appellant must file a notice of appeal "within 30 days from the date on the clerk's written notice of the decision on the merits." *See also* 4 AM. JUR. 2D *Appellate Review* § 81, at 709 (2007) (explaining that rules requiring a final decision on the merits prior to appeal promote efficient judicial administration and serve to prevent piecemeal appellate litigation). Failure to comply with this rule will result in a final judgment being entered "on the thirty-first day from the date on the Register's written notice that the [Probate] Court has made such order, decree or dismissal," PROB. CT. R. 74(a), thus making any appeal therefrom untimely, *see, e.g., In re Estate of Heald*, 147 N.H. 280, 281-82 (2001) (holding that a probate court's removal of an executor was a decision on the merits and dismissing the executor's appeal of that order two years later as untimely). The guardians do not contest that they failed to appeal the probate court's October 19, 2005 order. Therefore, if that order constituted a decision on the merits, *see* SUP. CT. R. 3, 7(1)(C) (defining "decision on the merits"), the guardians' appeal as to the issues decided therein must be barred as untimely.

■ We confronted a situation similar to the present one in *Germain v. Germain*, 137 N.H. 82 (1993). There, the trial court had bifurcated the proceedings in a divorce case and issued an order "that awarded the parties a decree of divorce and divided their property, but left the determination of custody and permanent child support to a further hearing." *Id.* at 83. When one of the parties subsequently appealed, we had to determine whether the trial court's order was a decision on the merits, permitting an appeal under Supreme Court Rule 7. *Id.* at 83-84. After recognizing that "[g]enerally, when a trial court issues an order that does not conclude the proceedings before it, . . . we consider any appeal from such an order to be interlocutory," we held that the court's order constituted a decision on the merits because the bifurcated issues remaining to be resolved were completely severable from those determined in the order. *Id.* at 84; *see Asmussen v. Comm'r, N.H. Dep't of Safety*, 145 N.H. 578, 585 (2000) (distinguishing *Germain* on the basis that the issues that remained following the court's order in that case were not severable from those in the court's order).

■■ The logic underlying our holding in *Germain* applies with equal force in the present case. In their October 7, 2004 petition, the guardians sought to have a particular estate plan adopted for Phi; they were not attempting to initiate some general estate planning proceedings. This is clearly evidenced by both the language of the guardians' petition—which

"request[ed] that the court accept and approve" the will that was attached to the petition—and the express language of RSA 464-A:26-a, III—which required the guardians to petition the court and describe, among other things, "the proposed *action*" that they were seeking to have approved. RSA 464-A:26-a, III(a) (emphasis added). Because all that was before the probate court was the adoption or rejection of the proposed plan, and that issue is entirely separate from those later considered by the court, *see Germain*, 137 N.H. at 84, the court's October 19, 2005 order rejecting the guardians' revised estate plan was a decision on the merits. *See* 4 AM. JUR. 2D, *supra* § 82, at 710 (2007) (explaining that "[a]s a general test, where no issue is left for future consideration except the fact of compliance or noncompliance with the terms of the decree, that decree is final").

■ While we acknowledge that the probate court also "invited" the parties to discuss the issues mentioned in its order and "perhaps" submit an alternative estate plan, we do not agree with the guardians that that mere invitation in any way compels a contrary holding. *See* 4 AM. JUR. 2D, *supra* § 83, at 711 (2007) ("A question remaining to be decided after an order has been entered ending litigation on the merits does not prevent finality if its resolution will not alter the order or moot or revise decisions embodied in the order. Thus, *the finality of a judgment is not necessarily destroyed by reservation of another separable and different cause for future adjudication*."). Nor do we agree that, under any interpretation, the court's order can be read as only rejecting the guardians' revised estate plan "in part." *See State v. Parker*, 155 N.H. 89, 91-92 (2007) (explaining how the interpretation of a trial court order is a question of law which we review *de novo*). Accordingly, we agree with Walker that the guardians' appeal is untimely insofar as it raises questions concerning the probate court's rejection of their revised estate plan.

Having determined that the guardians' revised estate plan is not before us, we turn now to the guardians' assertion that the probate court erred in rejecting their final plan. In essence, the guardians argue that the weight of the evidence proffered at trial demonstrated that their final estate plan was "consistent with [Phi's] cultural background and beliefs, [consistent with Phi's] history of giving to her parents and siblings, and satisfied the fundamental requirements of RSA 464-A:26-a." Thus, they assert that the probate court erred because the preponderance of the evidence indicates that their final estate plan made distributions to family "who would be likely recipients of gifts from" Phi. RSA 464-A:26-a, V(a). We disagree.

As noted above, in cases such as this where a "ward's wishes cannot be ascertained, the probate court may authorize the guardian of the estate to plan for the testamentary distribution of the ward's estate." RSA 464-

A:26-a, I. Before authorizing the guardian to so act, the probate court must find, among other things, that the preponderance of the evidence demonstrates that "[t]he testamentary distribution of the ward's estate [that is proposed] will . . . facilitate distribution of the ward's estate to family, friends, or charities who would be likely recipients of gifts from the ward." RSA 464-A:26-a, V(a).

██ ██ We note at the outset that the probate court did not make any express findings indicating upon what basis it was rejecting the guardians' final will. However, this deficiency is not fatal because neither party requested findings of fact or rulings of law, *see* RSA 567-A:4 (2007); *see also In re Jonathan T.*, 148 N.H. 296, 304 (2002), and, as we have previously stated, "in the absence of specific findings, the trial court is presumed to have made all findings necessary to support its decree," *Burns v. Bradley*, 120 N.H. 542, 546 (1980) (quotation omitted) (upholding a trial court's grant of directed verdict even though "the record d[id] not clearly reveal the precise legal grounds upon which the court based its decision"); *see also In re Lisa H.*, 134 N.H. 188, 195 (1991). Here, the probate court found in its October 19, 2005 order that "evidence may well support some nature, amount and manner of distribution to the parents and siblings of the ward, to generally reflect cultural norms and traditions . . . but the weight of and preponderance of th[e] evidence presented would be against the *percentages* and manner in which the proposed distributions would be made in" the revised estate plan. (Emphasis added.) At the same time, the guardians have conceded in their brief that their final estate plan employed distribution percentages that are substantially similar to those they used in the revised plan. Accordingly, we review the court's rejection of the final estate plan on that basis.

In so doing, we must accept "[t]he findings of fact of the judge of probate a[s] final unless they are so plainly erroneous that such findings could not be reasonably made." RSA 567-A:4 (2007). "Hence we must review the record of the proceedings before the probate court to determine if the findings, as made by the probate judge, could be reasonably made, given the testimony" and evidence presented at trial. *In re Buttrick*, 134 N.H. 675, 676 (1991). When engaging in this inquiry, we are guided by the rule that "[t]he trier of fact is in the best position to measure the persuasiveness and credibility of evidence and is not compelled to believe even uncontroverted evidence." *Restaurant Operators, Inc. v. Jenney*, 128 N.H. 708, 711 (1986); *see also Cook v. Sullivan*, 149 N.H. 774, 780 (2003) (explaining that the trial court is in the best position to "resolv[e] conflicts in the testimony, measur[e] the credibility of witnesses, and determin[e] the weight to be given evidence").

■ After reviewing the record, we hold that the probate court's finding that the preponderance of the evidence does not support the distribution percentages employed by the guardians is reasonable, based upon the evidence presented at trial. Admittedly, the guardians submitted testimony from two Vietnamese attorneys that they contend supported their distribution formula as being in accord with the Vietnamese culture and traditions. Even assuming the reliability and sufficiency of that evidence—which became more questionable upon cross-examination—we note that what is ultimately at issue is not the general testamentary practices of an entire society, but rather the testamentary wishes of Phi. *See* RSA 464-A:26-a, V(a). While evidence of religious or cultural traditions and customs may well be probative of an incapacitated ward's testamentary wishes, it is not dispositive. What must ultimately be shown, by a preponderance of the evidence, is that Phi would have abided by those customs and traditions in choosing her beneficiaries.

In an effort to demonstrate this connection, the guardians first submitted evidence that Phi had consistently made gifts of money to her parents and that "usually on New Year's" she would also make gifts of money to all of her siblings. The guardians also called one of Phi's co-workers, Barbara Roberge, and one of Phi's acquaintances, Bao Chau Kelley. Both of these witnesses similarly testified that Phi had, on several occasions, given money to both her parents and her siblings back in Vietnam. In addition, Kelley testified that she perceived Phi to be "a traditional Vietnamese woman." Finally, the guardians asserted, and the probate court found, that Phi "was proud of and shared her Vietnamese heritage with her daughter, . . . continued to cook in the Vietnamese tradition and continued her active participation in her religious heritage as a Buddhist."

However, Roberge stated that, while she believed that Phi considered herself Vietnamese and didn't "want[] to give up her culture," she also thought that Phi "was trying to be an American . . . [and] be married to an American." Moreover, Roberge testified that Phi loved Catherine "more than anything" and that, following her separation from Walker, Catherine was "her primary concern." This testimony comports with that of all the witnesses who knew Phi, who unanimously agreed that Catherine was the most important person in Phi's life.

That Catherine was Phi's utmost concern is also consistent with the evidence submitted by Walker in support of his argument that Phi would not have elected to give such substantial sums to her parents and siblings over her only daughter. For instance, Walker submitted evidence that, following their separation, Phi had designated Catherine as the sole beneficiary of her $20,000 life insurance policy, which was her only substantial asset at the time. Walker also called the attorney who had

represented Phi in her divorce proceeding, Barbara Griffin. Griffin explained that Phi had designated Catherine as her beneficiary in that policy because her "repeated statement and desire was that she wanted everything she had for [C]atherine." Finally, Griffin concluded that, through her representation, Phi had become a friend of "the office" and Griffin believed that she "would want her estate to go for the benefit of her daughter."

In light of all of the foregoing evidence, we cannot hold that the probate court's finding that the record does not support the "percentages and manner" in which the guardians are attempting to dispose of Phi's estate is "so plainly erroneous . . . [that it] could not be reasonably made." RSA 567-A:4; *see also Restaurant Operators, Inc.*, 128 N.H. at 711 (explaining that it is within the purview of the trial court to weigh the evidence). Therefore, we affirm the probate court's rejection of the guardians' final estate plan.

*Affirmed in part; reversed in part; and remanded.*

BRODERICK, C.J., and DALIANIS, J., concurred.