Hillsborough County Probate Court
No. 2007-786

IN RE GUARDIANSHIP OF DONALD A. DOMEY

Argued: June 26, 2008
Opinion Issued: October 29, 2008

*Nelson, Kinder, Mosseau & Saturley, P.C.*, of Manchester (*John C. Kissinger, Jr.* on the brief and orally), for petitioner Larrie Bratko, Guardianship Services of New Hampshire.

*Hamblett & Kerrigan, PA*, of Nashua (*J. Daniel Marr* and *Andrew J. Piela* on the brief, and *Mr. Marr* orally), for petitioner George Domey.

*Kalil & LaCount*, of Rye (*Earl L. Kalil, Jr.* on the brief and orally), for the respondent.

BRODERICK, C.J. The petitioners, Larrie Bratko and George Domey, co-guardians over the person and estate of Donald Domey, the ward, appeal a decision of the Hillsborough County Probate Court (*Cloutier*, J.) awarding the respondent, Judith Domey, damages and support arrearages. We reverse.

I

The record supports the following facts. In October 2003, Donald Domey suffered a stroke that rendered him totally incapacitated. He became a patient in the rehabilitative unit at Greenbrier Terrace Rehabilitation Center (Greenbrier) in Nashua until November 2004, when he was moved to a long-term care room.

In February 2004, his brother, George Domey, filed an *ex parte* petition seeking a guardianship over his person and estate. The petition alleged that Donald's wife, Judith, had failed to act in Donald's best interest, had engaged in physically and verbally abusive behavior toward him and had forced him to execute legal documents despite his incapacity. In March, the probate court appointed George Domey and Larrie Bratko, a professional guardian, as co-guardians. The court also appointed Attorney Jody Wilbert as guardian ad litem for Donald.

Over the ensuing months, the co-guardians attempted to identify Donald's assets, a task made difficult because of Judith's lack of cooperation and an atmosphere of mistrust between the parties. In May, the co-guardians filed a motion to compel Judith to allow an appraisal of the marital home in Salem and to produce a complete list of all accounts and holdings that were either in Donald's name or held jointly by them. The guardian ad litem filed a report with the court supporting the motion, indicating that she remained involved in this matter "in particular, because the guardians have been thwarted in their efforts to perform their duty to provide for the physical wellbeing of the ward, as well as to prepare an inventory of the assets of the ward." She concluded that Judith, "together with various of her children and her parents, either cannot or will not cooperate with the duly appointed guardians" and that it "is clear that the Court's intervention is necessary to assure that the guardians have access to financial information so that they can establish a plan that will provide for both the ward and for his wife." The court granted the motion.

In September, the guardian ad litem filed a supplemental report with the probate court. She concluded that "based on her communications with the professionals intimately involved in Mr. Domey's care, [she] remains

convinced that Mr. Domey is in need of a guardian. Absent a disinterested guardian, Mr. Domey would be at the mercy of those who may be unwilling or unable to acknowledge his frailty, or who may lean on him to 'decide' things that are not in his best interest."

Larrie Bratko completed an inventory in December, which showed more than $730,000 in total assets. Of these, approximately $353,177 were liquid assets and approximately $385,500 were real estate, primarily the marital home. Additionally, Donald's estate had an income of approximately $5,700 per month, including pensions and social security. The probate court approved the inventory filing.

In January 2005, Greenbrier notified the co-guardians that the overdue bill for services to Donald exceeded $63,000. Although Judith had informed the co-guardians that her husband had long-term disability insurance coverage, when he was moved from rehabilitative care to long-term custodial care, his expenses ceased to be covered. Larrie Bratko then filed a motion to liquidate Donald's assets in order to pay the Greenbrier bills, which the court granted.

In April, Judith filed petitions for spousal support and estate planning. The co-guardians objected to both, noting that there "[was] no specific statutory authority or guidelines within NH RSA 464-A:26-a for the relief requested." The co-guardians also expressed concern about Judith's failure to cooperate with their efforts to identify Donald's assets. In addition, they noted that the proposed estate plan "creates a foreseeable risk that the ward will be deprived of sufficient assets to cover his needs."

The guardian ad litem also objected, noting that "this case differs from many similar cases in that the Guardian ad Litem has more than adequate reason to believe that the ward . . . needs additional protection beyond that which would be afforded if he were merely a Medicaid recipient." As she explained, "[t]he ward's continuing need for guardians, and potentially for counsel and a Guardian ad Litem, requires that funds be available to the ward. In other words, if the ward is 'impoverished,' as Medicaid recipients must be to become eligible for same, it is foreseeable that his needs will not be adequately met." The guardian ad litem concluded that Judith's past conduct led the guardian ad litem to believe that it was not in Donald's best interest for her to support the petition for estate planning absent monetary protection for his needs.

In September, the probate court approved the parties' stipulation for estate planning and for spousal support. The stipulation provided that the co-guardians were to pay Greenbrier any outstanding balance; pay $50,000 into a special needs trust for Donald's benefit; pay enough assets to Judith to bring the assets held in her name to the Medicaid spousal resource limit of $95,100; prepay Donald's funeral expenses; apply the remainder of the

assets towards the Domeys' outstanding mortgage on the homestead in Salem; and transfer to Judith all of Donald's interest in real estate in Pittsburg, New Hampshire and Florida. In addition the co-guardians were to pay monthly support to Judith out of her husband's income.

By October, it became apparent that there were significantly fewer assets in the estate than the parties realized at the time of the stipulation because Donald's care at Greenbrier had eroded the liquid assets of the estate, leaving approximately $75,000. In January 2006, Donald qualified for Medicaid. The co-guardians submitted annual accountings to the probate court for the years 2004-2007. Judith objected to each of the accountings and requested a hearing. Following a three-day bench trial in June 2007, the court issued an order removing the co-guardians and awarding Judith damages of $84,838 and support arrearages of $33,415.

## II

On appeal, the petitioners argue that the probate court erred: (1) by finding that they breached duties owed to Judith and ruling that they were personally liable for such damages; and (2) by ruling that they breached a duty to conduct estate planning prior to the time court authorization had been obtained.

"The findings of fact of the judge of probate are final unless they are so plainly erroneous that such findings could not be reasonably made." RSA 567-A:4 (2007). "Consequently, we will not disturb the probate court's decree unless it is unsupported by the evidence or plainly erroneous as a matter of law." *In re Angel N.*, 141 N.H. 158, 161 (1996) (quotation and brackets omitted).

## III

The first issue is whether the probate court erred in ruling that the petitioners had a fiduciary duty to impoverish the ward in order to qualify him for Medicaid so that his assets could be protected for his spouse. The petitioners argue that "[i]n the absence of any statutory or case law authority imposing a duty of guardians to disregard the interests of the ward and act to advance the spouse's objectives, it was clear error for the probate court to so rule." We agree.

The powers and duties of guardians in this state are specified in RSA chapter 464-A (2004 & Supp. 2007). "When interpreting the language of a statute, we ascribe the plain and ordinary meaning to the words used and discern the legislative intent from the statute as written." *In re Guardianship of Luong*, 157 N.H. 429, 435 (2008). "We will not consider what the legislature might have said, or add language that the legislature did not see

fit to include." *Id.* "When the language of a statute is plain and unambiguous, we do not look beyond it for further indication of legislative intent." *Id.*

The purpose of RSA chapter 464-A is "to promote and protect the well-being of the proposed ward in involuntarily imposed protective proceedings." RSA 464-A:1 (2004). RSA 464-A:26, I (2004) reads, in pertinent part:

> It is the duty of the guardian of the estate to protect and preserve it, to retain, sell and invest it as hereinafter provided, to prosecute or defend actions, claims or proceedings in any jurisdiction for the protection of the estate's assets, to account for it faithfully, to perform all other duties required by law, and at the termination of the guardianship to deliver the assets of the ward to the persons entitled thereto. The guardian of the estate shall apply the money and property for the support, care, and education of the ward, but, the guardian may not use funds from the ward's estate for room and board which the guardian or his or her spouse, parent, or child have furnished the ward unless a charge for the service is approved by order of the court made upon notice to at least one of the next of kin of the ward, if notice is possible.

■ Under the plain language of the statute, its primary objective is to protect the well-being of the ward. The primary duty of the guardian is to protect the estate's assets in order to apply them for the support and care of the ward. Prior to 1979, the statutory duties of the guardian included applying the income of the ward's estate "for the comfortable maintenance and support of his ward, and his household and family, if any he have." RSA 462:4 (repealed 1979). The legislature omitted this language in the current statute and we will not "add language that the legislature did not see fit to include." *In re Guardianship of Luong*, 157 N.H. at 435.

The respondent argues that pursuant to RSA 546-A:2 (2007), the guardians owed her a duty of support. RSA 546-A:2 provides that "[e]very person whose income or other resources are more than sufficient to provide for his or her reasonable subsistence compatible with decency or health owes a duty to support or contribute to the support of his or her wife, husband, child, father or mother when in need." The respondent suggests that, read in conjunction with RSA 464-A:26, I, which imposes a duty upon the guardian to perform "all other duties required by law," the guardian assumes the ward's legal duty to support his spouse pursuant to RSA 546-A:2.

■ RSA 546-A:2 creates a right in, among others, a wife to sue for support when there is a showing of need and when there are "more than

sufficient" resources to provide for the reasonable subsistence of her husband. *See St. Joseph Hosp. of Nashua v. Rizzo*, 141 N.H. 9, 11 (1996). We do not disagree that in meeting the requirement imposed under RSA 464-A:26, I, to perform "all other duties required by law," a guardian may be required to consider the needs of the ward's spouse. *Cf. In re Wszolek Estate*, 112 N.H. 310, 316 (1972) (in managing the assets of her ward, guardian has "secondary duty" to consider the interest of ward's grand-daughter in joint account). The guardianship statute does not, however, impose a fiduciary duty upon a guardian to impoverish his or her ward in order to qualify the ward for Medicaid so that the ward's assets can be protected for the spouse, nor does it impose a fiduciary duty upon guardians to provide for the ward's spouse in the absence of findings pursuant to RSA 546-A:2. We reverse the probate court's ruling to the contrary and its assessment of $33,415 in damages for spousal support arrearages.

The second issue is whether the probate court erred in ruling that the petitioners breached a duty to conduct estate planning. The probate court awarded the respondent $84,838 as "damages which had to be paid to the nursing home for the failure to initiate estate planning so Mr. Domey could qualify for Medicaid." The petitioners argue that the court's decision is erroneous as it "failed to follow the procedure for estate planning specifi-cally set out in RSA 464-A:26-a." The respondent argues that the petition-ers had "a duty to preserve the Ward's estate through timely estate planning and timely Medicaid planning, which would have preserved sufficient assets to provide for [her] comfort and support."

■ RSA 464-A:26-a, I, provides that where a "ward's wishes cannot be ascertained, the probate court *may* authorize the guardian of the estate to plan for the testamentary distribution of the ward's estate in order to minimize taxation or to facilitate distribution of the ward's estate to family, friends, or charities who would be likely recipients of gifts from the ward." (Emphasis added.) The statute thus establishes a process whereby the guardian of an estate has the *option* to petition the probate court for authorization to engage in estate planning, but the statute does not establish any duty on the part of the guardian to do so. We hold that the probate court erred as a matter of law in ruling that the co-guardians breached a duty to conduct estate planning and we reverse the court's assessment of $84,838 in damages.

*Reversed.*

DALIANIS, DUGGAN, GALWAY and HICKS, JJ., concurred.