6th Circuit Court — Franklin Family Division
No. 2013-276

IN RE SOPHIA-MARIE H.

Submitted: September 19, 2013
Opinion Issued: October 1, 2013

*Law Office of Joshua L. Gordon*, of Concord (*Joshua L. Gordon* on the brief), for the mother.

*Nancy K. Quinlan*, of Dover, on the brief, for the father.

CONBOY, J. The respondent, the father of Sophia-Marie H. (father), appeals an order of the 6th Circuit Court — Franklin Family Division (*Gordon*, J.) terminating his parental rights. *See* RSA 170-C:5 (2002 & Supp. 2012). He argues that the evidence does not support the family division's findings: (1) that he failed to support, educate, and care for Sophia-Marie; and (2) that termination of his parental rights is in Sophia-Marie's best interest. We reverse.

The record supports the following facts. Sophia-Marie was born on November 10, 2008. She lived with the father and her mother, the petitioner (mother), until November 2009, when the father moved out. In February 2010, the mother filed a parenting petition seeking full custody of Sophia-

Marie. The trial court granted the mother primary residential responsibility for Sophia-Marie until further hearing and awarded the father regular supervised parenting time.

On August 17, 2010, the father was incarcerated in the New Hampshire State Prison as a result of convictions for the possession and sale of drugs. On December 6, the trial court issued a final decree and parenting plan awarding the mother sole custody of Sophia-Marie. The court recommended that the father have no visitation with Sophia-Marie while he was in prison, but noted that after he was released from prison he could file a motion for the court to consider "whether he should have parenting rights." The court further ordered the father to pay $50 a month in child support, which would accrue as an arrearage during his incarceration "to be paid after he obtains employment."

During his incarceration, the father sent at least sixteen letters to Sophia-Marie between October 8, 2010, and October 17, 2011. The father also made telephone calls to the mother and Sophia-Marie between November 2010 and February 2011. The mother then changed her telephone number so that the father could no longer contact them. The father testified that he continued to call for a few more months because he "thought maybe the phone was just turned off." In November 2011, after being released to a halfway house, the father telephoned the child's maternal grandmother in an attempt to contact the mother and Sophia-Marie. The grandmother hung up on him. She then advised prison authorities that she did not want the father contacting her. The father testified that a prison official told him that further attempts to contact the mother could result in his return to prison.

On February 13, 2012, the father was released from incarceration. In April, he filed a motion seeking to reinstate visitation with Sophia-Marie. In August, the mother filed a petition seeking termination of the father's parental rights on grounds of abandonment and nonsupport. *See* RSA 170-C:5, I, II (2002). That same month, the court held a hearing on the father's motion seeking visitation and, thereafter, issued an order awarding the father supervised visitation with Sophia-Marie. However, no visitation occurred because visitation was thereafter suspended pending resolution of the mother's termination petition.

On February 20, 2013, the court held a hearing on the termination petition. At the hearing, the mother testified that she and Sophia-Marie live with the mother's fiancé. She stated that Sophia-Marie refers to him as "daddy" and that, if the termination petition were granted, he would adopt Sophia-Marie. The mother testified that she did not inform Sophia-Marie about the letters that the father had sent and that, although she has not told Sophia-Marie that he is her father, she plans to do so eventually. She

further testified that the only child support payment she had received from the father since his release from incarceration was in December 2012.

At the final hearing, the father admitted that, prior to his incarceration, he was not a very good father to Sophia-Marie, but that he was now committed to being in her life. He testified that it does not bother him that Sophia-Marie refers to the mother's fiancé as "daddy" and that he believes that the relationship Sophia-Marie has with the mother's fiancé is good for her. He testified that he obtains sporadic employment from his father as a painter and remodeler, but that he was currently "on leave" because there was "no work temporarily." He stated that, although he did not provide financial support for Sophia-Marie prior to his incarceration, he had started paying child support.

Sophia-Marie's guardian ad litem (GAL) submitted a detailed final report that recommended that the termination petition be denied. At the hearing, the GAL testified that this was not an easy decision. He stated that the father appears to be a changed man and has "made an effort to turn his life around [and] he wants to be involved in [his] daughter's life." When asked by the court whether he thought it was in Sophia-Marie's best interest to create a relationship with the father, the GAL testified that he had spoken with the father's parole officer and counselor and "they both think he's doing well," but that the father's "track record" concerned him. However, he also expressed concern that, if the termination petition were granted and the father "has pulled it together," then Sophia-Marie "would . . . miss[ ] out on [a] relationship" with her father. The GAL stated, "I don't have . . . a crystal ball." He later said, "I know what we have, but I'm just not sure what the future will hold, and I'm not sure how to weigh the risks and benefits of that."

In its termination order, the court found that the father had not abandoned Sophia-Marie, but that he had failed to support, educate, and care for her. *See* RSA 170-C:5, II. The court also determined that it was in Sophia-Marie's best interest to terminate the father's parental rights. The father's motion for reconsideration was denied, and this appeal followed.

 Parental rights are "natural, essential, and inherent" within the meaning of Part I, Article 2 of the New Hampshire Constitution. *In re Jack L.*, 161 N.H. 611, 614 (2011) (quotation omitted). The dominant consideration in termination proceedings under RSA chapter 170-C (2002 & Supp. 2012) is the welfare of the child, which prevails over the interests of the parents. *In re Jack L.*, 161 N.H. at 614.

 Before a court may order the termination of a parent's rights, the petitioning party must prove a statutory ground for termination beyond a reasonable doubt. *In re Haley K.*, 163 N.H. 247, 249 (2012); *see* RSA

170-C:5; RSA 490-D:2, VII (2010) (authorizing family division to exercise jurisdiction over termination of parental rights cases under RSA chapter 170-C). Once a statutory ground is established, the court must then consider whether termination is in the child's best interest. *In re Adam R.*, 159 N.H. 788, 792 (2010). Such a determination requires assessment of which of the possible alternative dispositional orders is the most desirable, under a standard giving priority to the assumed interest of the child. *In re Shannon M.*, 146 N.H. 22, 28 (2001); *In re Adam R.*, 159 N.H. at 792 (in weighing fundamental rights of parent against best interest of child under RSA chapter 170-C, dominant consideration is welfare of child, which must prevail over interest of parent). We will affirm the trial court's order unless it is unsupported by the evidence or plainly erroneous as a matter of law. *See In re Haley K.*, 163 N.H. at 249.

As a threshold matter, the mother asserts that we should dismiss the father's appeal because he has failed to allege that the court's order was plainly erroneous as a matter of law. We disagree. The father argues that the trial court erred in terminating his parental rights because the mother failed to prove, beyond a reasonable doubt, that he did not adequately support, educate, and care for Sophia-Marie and that termination was in Sophia-Marie's best interest. Thus, he contends that the trial court's decision terminating his parental rights was unsupported by the evidence and, therefore, erroneous as a matter of law. We therefore decline to dismiss his appeal on this ground.

The father first argues that the mother failed to "provide sufficient evidence to prove, beyond a reasonable doubt, that [he], although financially able to do so, had failed to support" Sophia-Marie under RSA 170-C:5, II. We agree.

RSA 170-C:5, II authorizes termination when,

> *although the parents are financially able,* they have substantially and continuously neglected to provide the child with necessary subsistence, education or other care necessary for his mental, emotional, or physical health or have substantially and continuously neglected to pay for such subsistence, education or other care when legal custody is lodged with others.

RSA 170-C:5, II (emphasis added). Because the mother has sole legal custody of Sophia-Marie, she had the burden to prove, beyond a reasonable doubt, that the father was "financially able" but nonetheless had "substantially and continuously neglected to pay for [the child's necessary] subsistence, education or other care." RSA 170-C:5, II.

The statute does not define, and we have not addressed, what it means to be "financially able" in this context. We need not do so here, however, because the record contains scant evidence as to the father's financial circumstances. The evidence concerning the father's employment was limited to testimony that he was sporadically employed by his father, but that he was currently "on leave" because there was "temporarily" no work. The mother had the heavy burden to produce evidence demonstrating beyond a reasonable doubt that the father was "financially able" to pay for Sophia-Marie's care, but substantially and continuously neglected to do so. The mere fact that the father had sporadic employment does not establish, beyond a reasonable doubt, his ability to provide for Sophia-Marie.

The mother points to the father's fianceé's opinion that he is a good provider for her family to show that he was "financially able" to provide for Sophia-Marie. The fact that the father's fianceé believes that the father is "a good provider" for her family, however, does not establish that the father is "financially able" to support Sophia-Marie. Moreover, although the mother testified, and the trial court found, that the father was not current on his court-ordered child support payments, in the absence of any evidence demonstrating his ability to make such payments, the mother failed to meet her burden of proving he was "financially able."

To the extent that the court relied upon the father's failure to pay child support during his incarceration as evidence that the mother met her burden, this was error. It is true that incarceration did not absolve the father of his parental obligation to provide for the care of his child. *See In re Haley K.*, 163 N.H. at 252. However, the final decree on the parenting plan provided that the father's child support obligation would accrue as an arrearage during his incarceration "to be paid after he obtains employment." Thus, the father's failure to pay child support while he was incarcerated was anticipated, and his obligation to do so was postponed, by the family division. Therefore, the father's failure to pay support during his incarceration cannot be used to meet the mother's burden under RSA 170-C:5, II. *Cf. In re Sheena B.*, 139 N.H. 179, 184-85 (1994) (lack of contact when father was subject to restraining order prohibiting contact with child was not evidence of abandonment where record did not support a finding that father engaged in conduct that he knew, or should have known, would lead to loss of opportunity to see his child). Accordingly, we conclude that the evidence did not support the trial court's finding that the mother proved beyond a reasonable doubt that the father failed to provide for Sophia-Marie's support, education, or care under RSA 170-C:5, II. Therefore, that finding was erroneous as a matter of law.

In light of our determination that the mother failed to prove a statutory ground for termination, we need not address the trial court's finding that

termination of the father's parental rights was in the best interest of Sophia-Marie. *See In re Lisa H.*, 134 N.H. 188, 193 (1991) (noting that trial court's consideration of child's best interest is necessary only after finding one of the statutory conditions for termination of parental rights). However, because this issue could arise in a future proceeding between these parties and because both parties discuss it in their briefs, we take the opportunity to explain why, on this record, the trial court erred in its finding. *Cf. George v. Al Hoyt & Sons, Inc.*, 162 N.H. 123, 138 (2011).

The court determined that termination of the father's parental rights was in Sophia-Marie's best interest based upon the GAL's report and "the evidence received at the hearing." The court observed that Sophia-Marie "has no bond with or connection to [the father] and is apparently unaware of his existence." The court concluded that "[a]ttempting to reintroduce [the father] into [Sophia-Marie's] life at this point would be difficult and confusing" and the mother's fiancé, "whom she already considers to be her father, is willing and prepared to adopt her."

We recognize that the difficulty and confusion that may result from reintroducing the father to Sophia-Marie is a factor to be considered in assessing whether termination of the father's parental rights is in Sophia-Marie's best interest. *Cf. In re Jessica B.*, 121 N.H. 291, 296 (1981) (upholding termination of parental rights where part of basis for termination was that child had not lived with mother for nearly five years and saw mother only occasionally). Sophia-Marie has not seen the father since she was nearly two years old. She is now almost five years old and, in that time, she has developed a strong relationship with the mother's fiancé.

However, the father has endeavored to maintain a relationship with Sophia-Marie, and we cannot ignore the fact that to the extent that Sophia-Marie does not know her father, it is, in part, due to the mother's decision not to disclose the father's attempts to contact her or even that he is her father. It cannot be assumed that termination is in the best interest of a child where the child's lack of knowledge of the parent whose rights are being terminated is due, in part, to the other parent's efforts to thwart attempts made to establish a relationship with the child. *Cf. In the Matter of Miller & Todd*, 161 N.H. 630, 641 (2011) (stating that "the obstruction by a custodial parent of visitation between a child and the noncustodial parent may, if continuous, constitute behavior so inconsistent with the best interests of the child as to raise a strong possibility that the child will be harmed" (quotation omitted)); *In re Sheena B.*, 139 N.H. at 184 (finding no statutory abandonment by one parent where separation from the child is caused solely by the other parent). Although it might be difficult and confusing for Sophia-Marie to be reintroduced to her father, we cannot say,

under the facts of this case, that it would be in her best interest to terminate his parental rights and deny her the opportunity of reunification. *Cf. In re Lisa H.*, 134 N.H. at 193 (child's identification of foster parents as "mom" and "dad" was one factor to consider in conjunction with other factors).

Moreover, there is no evidence that the strength of the relationship Sophia-Marie has with the mother's fiancé would be disrupted if the father's parental rights are not terminated. The mother has legal and physical custody of Sophia-Marie, and she will remain with both the mother and the mother's fiancé, absent further court order. The record does not reflect any effort by the father to acquire legal and physical custody of his daughter or to disrupt the relationship that she has with the mother's fiancé. Indeed, the father testified that he believes the relationship Sophia-Marie has with the mother's fiancé is good for her. The father merely wants the right to visit with his daughter to rebuild their relationship. *Cf. In re William A.*, 142 N.H. 598, 601-02 (1998) (termination not in best interest of child where mother merely wanted to visit with child and had consented to step-mother's appointment as legal guardian).

Furthermore, the evidence suggests that the father has enhanced his ability to have a positive relationship with Sophia-Marie. During his incarceration he completed a parenting class "designed to promote healthy parenting skills" and "responsible [f]atherhood." *See id.* (evidence that mother had enhanced her ability to parent where she was participating in parenting classes supported denying termination petition). The GAL testified that the father has "made an effort to turn his life around [and] he wants to be involved in [his] daughter's life." The GAL testified that he spoke with the father as well as the father's counselor and parole officer, and it appears that the father has changed his life. We recognize the GAL's concern that the father's future behavior cannot be predicted. However, we cannot say that the inability to predict the father's future behavior supports a finding that termination is in Sophia-Marie's best interest. Indeed, the GAL also testified that he was concerned that if termination were ordered, Sophia-Marie would miss out on having a relationship with her father. *Cf. id.* at 601.

We note that trial courts have broad discretion in managing visitation and a child's contact with noncustodial parents. *See In the Matter of Miller & Todd*, 161 N.H. at 640. This discretion affords trial courts various means by which to protect a child from the difficulty and confusion associated with reunification, short of terminating parental rights. As we have said before, termination of a parent's legal bond to a child is a solemn and irreversible event of constitutional import. *See In re William A.*, 142 N.H. at 602.

Although termination is sometimes required to protect a child's best interest, this is not such a case. Accordingly, we conclude that the trial court erred in finding that termination was necessary.

*Reversed.*

HICKS, LYNN and BASSETT, JJ., concurred.