NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

6th Circuit Court-Concord Family Division
No. 2018-0440


IN RE H.J.


Submitted: November 28, 2018
Opinion Issued: December 21, 2018


Petitioner, the mother of H.J., self-represented party, by brief.


Law Office of Gary Paradis, PLLC, of Manchester (Gary Paradis by brief), for the father.


BASSETT, J. The respondent, the father of H.J. (child), appeals an order of the Circuit Court (Tenney, J.) terminating his parental rights. See RSA 170-C:5 (2014). He argues that the evidence does not support the circuit court's findings that: (1) he had abandoned the child; (2) he had not paid sufficient support; and (3) termination of his parental rights was in the child's best interest. We affirm.

The record supports the following facts. Approximately one month after the child was born, the father was incarcerated. After the father was released, the child lived with both parents. In February 2009, the mother moved out after an incident of domestic violence. From June 2009 through September 2010, a domestic violence order was in place against the father. In April 2009, the mother filed a parenting petition. The father did not appear at any of the hearings in the parenting case. In December 2009, the mother was granted sole legal and physical custody of H.J. The parenting plan granted the father

supervised visitation once a week at his expense, but gave the mother discretion to refuse such visits. The plan stated that the father "may petition the court for further orders" at such time that "he believes that he can be a positive and consistent influence in [the child's] life."

The father visited H.J. twice at a visitation center in February and March of 2010. On March 20, 2010, he failed to appear for a scheduled visit. Around this time, he was incarcerated. When he was released in early 2011, he contacted the visitation center requesting to visit H.J. The mother exercised the discretion granted to her by the parenting plan and denied his request. She expressed concern that visitation would be emotionally disruptive to the child because the father's frequent incarcerations would not allow him to become a consistent part of the child's life. The father appears to have done nothing at this time to challenge the mother's decision. The father was re-incarcerated in 2012.

In 2013, while still incarcerated, the father filed petitions requesting a change to the parenting plan. The court denied the petitions, observing that the father was incarcerated and "not in a position to exercise his parenting time . . . because of his circumstances." The court noted that "[a]t such time as he is released, [the father] can contact the [visitation center], who can then contact [the mother]."

The father was released from incarceration in January 2014. He testified at the hearing on the termination of his parental rights that he "probably" contacted the visitation center at that time, but did not "remember exactly." He also testified that he did not file any additional petitions with the court seeking visitation because he was "dealing with these legal issues," had limited transportation, and "had a lot on [his] plate." At some point in 2015 the father was re-incarcerated. In early 2016, he was released. Approximately a year later, in February of 2017, he was re-incarcerated.

In October of 2017, the mother filed a petition seeking termination of the father's parental rights on the grounds of abandonment and non-support. At the hearing on the petition, the mother requested that the court terminate the father's parental rights over H.J. so that her husband, who "has been an active and constant part of [H.J.'s] life since 2010," could adopt H.J. She testified that, since July 21, 2009, she has only received $458.70 in child support and that her child support case was closed in 2014. She acknowledged that the father has occasionally sent correspondence to H.J. including "a bunch of cards in 2010," a Toys"R"Us gift card, two letters in 2016, and a birthday card in 2017. She testified that she shared these communications with H.J. and has saved them.

The father testified that, although he has been in jail for four of the last eight years, he never intended to abandon the child. He also testified that he

had "never been given the opportunity to be a father to [his child] . . . and it hasn't been for a lack of trying."

The guardian ad litem (GAL) submitted a final report recommending that the court terminate the father's parental rights. At the hearing, the GAL testified that even though the father may not have desired to abandon the child, there has "been a substantial period of time since there has been any contact," and the father's "personal actions, his inability to stay out of criminal mischief . . . effectuated the abandonment." The GAL further testified that termination was in the child's best interest because the mother's husband was the child's "father figure," provided "day-to-day support and emotional support," and wished to adopt H.J. The GAL recognized that the mother had exercised her right to deny visitation in 2011, which prevented the child from having contact with the father on that occasion, but concluded that the lack of a relationship between the child and the father was due to the father's consistent "renewal of [his] criminal activities."

In its termination order, the court found that the father had abandoned the child. See RSA 170-C:5, I. It also concluded that the father failed to provide adequate support. See RSA 170-C:5, II (stating that if "parents are financially able," but "have substantially and continuously neglected to provide the child with necessary subsistence, education or other care," then a statutory ground exists to terminate parental rights). The court also determined that termination of the father's parental rights was in the child's best interest. This appeal followed.

Parental rights are "natural, essential, and inherent" within the meaning of Part I, Article 2 of the New Hampshire Constitution. In re Sophia-Marie H., 165 N.H. 332, 335 (2013). The dominant consideration in termination proceedings under RSA chapter 170-C is the welfare of the child, which prevails over the interests of the parents. Id.

Before a court may order the termination of a parent's rights, the petitioning party must prove a statutory ground for termination beyond a reasonable doubt. Id. Once a statutory ground is established, the court must then consider whether termination, or some alternative dispositional order, is in the child's best interest. Id. We will affirm the trial court's order unless it is unsupported by the evidence or plainly erroneous as a matter of law. In re Sophia-Marie H., 165 N.H at 336.

The father first argues that the trial court erred when it determined that the mother had proven beyond a reasonable doubt that the father abandoned his child. RSA 170-C:5, I, authorizes termination when:

The parent has abandoned the child. It shall be presumed that the parent intends to abandon the child . . . who has been left by his

parent in the care and custody of another without any provision for his support, or without communication from such parent for a period of 6 months. If in the opinion of the court the evidence indicates that such parent has made only minimal efforts to support or communicate with the child, the court may declare the child to be abandoned.

RSA 170-C:5, I. "Abandonment is a factual issue to be determined by the [circuit] court, and we will not disturb that determination unless it is unsupported by the evidence or plainly erroneous as a matter of law." In re Shannon M., 146 N.H. 22, 25 (2001) (quotation omitted). "The six-month period of time during which there is no contact or support by the parent may trigger a finding of abandonment, but it does not mandate that finding." Id. (quotation omitted). Rather, the parent opposing termination has the opportunity to rebut the presumption of intent to abandon by offering evidence of events that occurred before, during, and after the triggering period. Id. The trial court must then consider the totality of the evidence to determine whether the presumption of intent to abandon has been rebutted. In re Deven O., 165 N.H. 685, 690 (2013). "In making this determination, the court should consider, among other things, the frequency and quality of the communication between the parent and child, the emotional and financial support provided by the parent for the child, and whether the overall conduct of the parent evidences a willingness to take on responsibility and concern for the child's physical and emotional care and well-being." Id. at 690-91 (quotation omitted). The court may declare the child abandoned if it finds that the parent has made "'only minimal efforts to support or communicate with the child.'" In re Sheena B., 139 N.H. 179, 181 (1994) (quoting RSA 170-C:5, I).

At the termination hearing, the father's counsel acknowledged that there were periods during which the father left H.J. in the mother's care and custody without communication for at least six months. Therefore, the statutory presumption is triggered. On appeal, the father argues he rebutted the presumption, contending that he did not intend to abandon H.J. He asserts that "it was the mother's refusal to permit or facilitate visits or contact that were the major barrier to a relationship between the father and [H.J.]." He further contends that the trial court erred because it failed to properly consider the "totality of the evidence," and "events that occurred before, during and after the triggering period." See In re Jessie E., 137 N.H 336, 342 (1993). We disagree.

"Strictly speaking, there is no abandonment by a parent where the separation of parent and child is caused solely by the other parent or a third party and because of no fault on the part of the parent whose rights are sought to be terminated." In re Shannon M., 146 N.H. at 26 (quotation omitted). "'Fault' in this context would include the absence of efforts to reinitiate contact on the part of the parent whose rights are sought to be terminated." Id.

4

(quotation omitted).  Here, however, the trial court explicitly considered whether the mother's actions were responsible for the lack of contact between the father and H.J., and concluded that "[t]he blame clearly rests with [the father], whose extensive criminal activities and numerous incarcerations have left him unable to be a parent to [H.J.]."  The court also observed that even though a 2013 court order instructed the father that he could seek visitation after being released from jail, he "never followed through, despite ample time and opportunity to do so."  The court concluded that the father's reasons for not seeking visitation — specifically that he had "a lot on [his] plate" and lacked transportation — were not only "a weak excuse, but also a very telling example of his on-again, off-again interest in being a parent to [H.J.]."  On this record, we cannot conclude that the trial court erred in finding that the father's contacts with H.J. were "minimal and not substantial," and that the father, "through his actions, has abandoned [H.J.]."

To the extent that the father is also arguing that the trial court erred because it "could not consider his contact or lack of contact during [the] time he was prohibited by restraining order from contacting or supporting [the] child," we disagree.  We have previously held that "a finding of abandonment is not precluded merely because the initial separation of the [parent] and child resulted from a court order and against the will of the [parent]."  In re Sheena B., 139 N.H. at 184 (quotation omitted).  Although, "[t]hat, of course, is a factor to be considered on the question, . . . subsequent conduct on the part of the parent thereafter may be found to constitute abandonment."  Id. (quotation omitted).  Moreover, here the record does not reflect that the restraining order interfered with the father's ability to contact H.J.; indeed, the last two times that the father visited the child took place in early 2010, during the period covered by the restraining order.

We also reject the father's assertion that the trial court should have given more weight to his attempts to communicate with the child before and after the triggering period.  At the termination hearing, the father testified that he e-mailed the mother "over the years . . . at least a dozen times," and the mother acknowledged that the father has occasionally sent correspondence to H.J.  The trial court concluded that these "other contacts . . . are minimal and not substantial."  See In re Jessie E., 137 N.H. at 343 ("A court may declare a child abandoned if it finds objectively that the parent has made only minimal efforts to support or communicate with the child."); see also In re Sheena B., 139 N.H. at 181 ("The presumption of abandonment will not be rebutted upon a showing of a mere flicker of interest." (quotation omitted)).  The trial court ruled that the mother "has presented proof, beyond a reasonable doubt, that [the father] has abandoned [H.J.]."  We will not disturb this factual finding because the father has not demonstrated that it is unsupported by the evidence or plainly erroneous as a matter of law.  See In re Shannon M., 146 N.H. at 25.

5

A termination of parental rights "petition may be granted where the court finds that <u>one</u> or more" of the listed statutory grounds exist. RSA 170-C:5 (emphasis added). Therefore, we need not analyze the father's argument that the trial court erred in determining that the father had not "paid sufficient support" because, even if true, it would provide no basis for reversal. <u>See, e.g.</u>, <u>In re G. B.</u>, 167 N.H. 99, 105 (2014).

Having concluded that a statutory ground exists for termination, we now consider the father's argument that the trial court erred in ruling that termination was in the best interest of the child. The trial court reasoned that the child is "happy, living with the only family [the child] knows, cared for by the only parent . . . that has ever cared for [H.J.], and [a] stepfather, who now seeks to adopt [H.J.] and give [the child] a greater security in their relationship." The court also reasoned that "loss of contact with [the] birth father . . . is not a significant loss to this child, since [H.J.] does not even know him." It concluded that "termination is necessary in order to facilitate an adoption of [H.J.] by [the] stepfather . . . which is desired by the child."

The father argues that the trial court's best interest ruling is erroneous because the trial court gave "insufficient weight . . . to the fact that the mother admitted an unwillingness to facilitate visits between the father and [H.J.]." Although the father recognizes that the mother had a parenting plan that afforded her the discretion to deny visits, he argues that she "abused that authority by prohibiting contact between the father and [H.J.]." We disagree.

We recognize, as we have previously, that "[i]t cannot be assumed that termination is in the best interest of a child where the child's lack of knowledge of the parent whose rights are being terminated is due, in part, to the other parent's efforts to thwart attempts made to establish a relationship with the child." <u>In re Sophia-Marie H.</u>, 165 N.H. at 338. However, the facts of this case are distinguishable from <u>Sophia-Marie H.</u> In <u>Sophia-Marie H.</u>, a father attempted to maintain a relationship with his child and become a better father while incarcerated by: attempting numerous times to call the child from jail, writing many letters, taking a parenting class, and asking the court to reinstate visitation. <u>Id</u>. at 334, 339. The mother took multiple steps to keep the father from maintaining that relationship by: failing to deliver the father's letters, not disclosing the father's identity, changing her phone number so the father could no longer contact them, and precluding visitation by filing a petition seeking termination shortly after the father was released from incarceration. <u>Id</u>. at 334. The GAL recommended that the court deny the termination petition because the father had made efforts to turn his life around, and the GAL believed that the child would miss out on having a relationship with her father if the petition was granted. <u>Id</u>. at 335. The trial court found that the father had not abandoned his child; however, it found that other statutory grounds supported termination. <u>Id</u>. It then concluded that termination was in the child's best interest because the child "has no bond with or connection to the

6

father and is apparently unaware of his existence," and "attempting to reintroduce the father into Sophia-Marie's life at this point would be difficult and confusing." Id. at 338 (brackets omitted). We reversed, observing that "the father has endeavored to maintain a relationship with Sophia-Marie, and we cannot ignore the fact that to the extent that Sophia-Marie does not know her father, it is, in part, due to the mother's decision not to disclose the father's attempts to contact her or even that he is her father." Id.

Here, the father's efforts to establish a relationship with his child have been minimal. Unlike in Sophia-Marie H., the father chose not to contact or visit his child for long periods of time, even when he was not incarcerated. When the father petitioned to modify the parenting plan in 2013, the court concluded that he was "not in a position to exercise his parenting time" because he was incarcerated, and instructed the father to contact the visitation center upon his release. The record does not demonstrate that he subsequently contacted the center. Nor has the father ever sought to modify the original parenting plan to lessen the mother's ability to control visitation.

Here, also unlike in Sophia-Marie H., the mother's "interference" with the father's ability to build a relationship with H.J. has been minimal. Although she denied the father a single visit in 2011, as was allowed by the parenting plan, the mother has not kept the father's identity a secret from the child and she has given the child letters sent from the father. Therefore, the record supports the trial court's conclusion that the lack of a relationship between the father and H.J. is directly attributable to the father's failure to attempt to establish such a relationship, not the mother's purported attempt to thwart it.

The father also argues that the trial court erred in terminating his parental rights because the "mother admitted she did not do anything to facilitate a relationship between the father and his [child]." He cites In re William A., 142 N.H. 598, 600 (1998), for the proposition that he should be given additional time and opportunity to build a relationship with his child because there is no evidence to show that termination is necessary to ensure H.J. remains in a stable environment. In determining whether he should be given this opportunity, the dominant consideration is the welfare of the child, which prevails over the interests of the parents. In re Adam R., 159 N.H. at 792.

In re William A. involved a father's petition to terminate a mother's parental rights on the grounds of abandonment and non-support. In re William A., 142 N.H. at 600. William was in the legal custody of his father and his father's wife, William's stepmother. Id. The GAL recommended that the court not terminate the mother's parental rights because the mother had taken steps to improve her ability to have a positive and supportive relationship with William. Id. at 601-02. The mother merely wanted the right to visit her son, not legal or physical custody. Id. at 601. The GAL believed that such visitation

7

was in William's best interest; however, the trial court determined that it was in William's best interest to terminate the mother's rights. Id. We reversed, observing that the mother had taken steps to "enhance[] her ability to have a positive and supportive relationship with William," and that there was no evidence to suggest that terminating the mother's parental rights was necessary to keep the child in a stable environment. Id.; see also In re Sophia-Marie H., 165 N.H. at 339 (concluding that termination was not in the child's best interest after observing that the father whose rights were at issue was seeking to rebuild his relationship with his child in a manner that would not disrupt the child's relationship with her caregivers).

Here, however, unlike in In re William A., the record does not reflect that the father has taken meaningful steps to build a relationship with H.J. or improve his ability to become a positive and supportive figure in the child's life. The GAL observes that, although H.J. knows that the father occasionally writes or sends gifts, the child has "no real memory of him or of his direct presence," "8-years have passed since there have been visits," and the father has made "no effort . . . to avoid new or ongoing criminal activities." On this basis, the GAL concluded that termination was in the child's best interest. The trial court similarly concluded that despite the father's assertions that he loves his child and wants to be a part of H.J.'s life, "the reality of this situation is that he has led a life over the past eight years full of criminal activity, most of it of a serious nature, which has resulted in numerous incarcerations." The trial court reasoned that the father "seems to accept little to any responsibility for the effect these actions have had on his ability and availability for parenting," and observed that "[i]n the meantime, [H.J.] has moved on . . . and has done very well through the efforts of [the child's] mother and [the] stepfather."

"Implicit in [RSA chapter 170-C] is the philosophy that whenever possible family life should be strengthened and preserved." RSA 170-C:1. However, for the last eight years — because of his own actions and choices — H.J.'s biological father has not been a part of the child's family life. Instead, as the trial court observed, H.J. is "happy, living with the only family [the child] knows, cared for by the only parent . . . that has ever cared for [H.J.], and [a] stepfather, who now seeks to adopt [H.J.] and give [the child] a greater security in their relationship." Based upon this evidence, we conclude that the trial court's ruling that termination is in the child's best interest is supported by the evidence and not plainly erroneous as a matter of law. See In re Sophia-Marie H., 165 N.H at 336.

Affirmed.

LYNN, C.J., and HICKS, HANTZ MARCONI, and DONOVAN, JJ., concurred.